# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **JINEL SEXTON,** | * | **CIVIL ACTION** |
| **PETITIONER** | * | |
| | * | **CASE NO.   24-cv-1506** |
| **VERSUS** | * | |
| | * | |
| **EDWARD BICKHAM, WARDEN** | * | **SECTION "I" (1)** |
| **RESPONDENT** | * | |
| | * | |
| | * | |

## RESPONSE TO PETITION FOR *HABEAS CORPUS* RELIEF

Jinel Sexton is a state prisoner incarcerated at the Dixon Correctional Institute in Jackson, Louisiana. He is serving a fifty-year sentence following his conviction for sexual battery, victim under thirteen (La. R.S. 14:43.1) and subsequent adjudication as a second felony offender (La. R.S. 15:529.1).

Sexton has petitioned this Court for a writ of habeas corpus.

Sexton's petition is timely, and his claims are exhausted and not in procedural default. However, his claims lack merit. Accordingly, the Court should dismiss the petition with prejudice and otherwise deny relief.

**TABLE OF CONTENTS**

PRELIMINARY MATTERS..................................................................................3

PROCEDURAL HISTORY.................................................................................6

TIMELINESS.......................................................................................................8

EXHAUSTION AND PROCEDURAL DEFAULT..........................................8

MERITS REVIEW...............................................................................................8

    1.     The claim that the state district court judge lacked
             impartiality (Claim 9). ...............................................................9

    2.     The claims concerning the victim's urine drug screening
             results (Claim 2, Claim 4)........................................................13

    3.     The claims concerning the t-shirt worn by the victim at the
             time of the offense (Claim 3, Claim 5). ...................................21

    4.     The claim concerning the admission of the victim's pre-trial
             statements (Claim 7)................................................................25

    5.     The claim concerning the admission of jail calls (Claim 1). ................28

    6.     The claim arising from counsel's decision not to cross-examine
             the victim at trial (Claim 10). .................................................30

    7.     The claim that counsel to investigate petitioner's medical
             history (Claim 6). ....................................................................33

    8.     The claim concerning Dog the Bounty Hunter (Claim 8). ...................35

CONCLUSION AND PRAYER.........................................................................38

CERTIFICATE OF SERVICE..........................................................................38

<u>PRELIMINARY MATTERS</u>

**1.     Custody.**

The respondent does not dispute that the petitioner is in custody.

**2.     The state court record.**

The respondent has filed, along with this *Response*, the complete state court record which is described in the separately filed *Notice of Lodging of State Court Record Materials*.

**3.     The facts of the case.**

The facts of the case were forth at length by the First Circuit Court of Appeal in the opinion affirming the defendant's conviction and sentence and by the district court in denying post-conviction relief. *See* SCR, Vol. 7, pp. 16-28 & 69-86. The "statement of the facts" portion of the First Circuit's opinion is reproduced in the margin.[1] The short

---

1   The First Circuit wrote:

> On January 15, 2017, at 6:55 a.m., J.B. (the victim), who was twelve years old at the time, called 911 and reported being "raped" the night before. The incident occurred at the Abita Springs residence of the defendant, the biological father of the victim's older sister. The victim told the dispatcher that the defendant had left to go to work prior to the time of the call and that she was in the home alone, as the defendant's sons who lived there were at their grandmother's house at the time. She stated that she had already contacted her parents, who lived in Ponchatoula, and that they were on their way to the defendant's residence, but that she wanted someone closer to come to the residence. The victim also stated that the defendant had given her some "medicine" that was supposed to treat acne, adding that he had given her "two of them and a green tiny one." She further stated that she did not remember falling asleep, but noted that when she woke up, "[the defendant] was like touching all over me and stuff" The victim made consistent claims to Detective Carlee Messina of the St. Tammany Parish Sheriffs Office, who reported to the St. Tammany Parish Hospital, where the victim was transported by the 911 responders.
>
> Later that morning, the defendant was transported by deputies to Detective Messina's office. Detective Messina informed the defendant of his *Miranda* rights and a waiver of rights form was executed. After the interview, Detective Messina obtained a warrant for the defendant's arrest, a search warrant for his residence, and later obtained a search warrant for the defendant's DNA. In executing the search warrant for the defendant's residence, Detective Messina

version is that the twelve year victim "went to bed in her sister Brooklynn's room but when she awoke, she was in Defendant's bed and he was touching her private parts with his penis." SCR, Vol. 7, pg. 70. The victim called 911 and was brought to the hospital, where benzodiazepines were detected in her urine. *Id*. Later, the crotch portion of her panties tested presumptively positive for semen and "a DNA profile

---

recovered and/or photographed several items including a green t-shirt with gray print on it, bedding, a Flintstones vitamin bottle, and prescription bottles. In addition to the pretrial interview, the defendant testified at trial. The defendant denied having given the victim any medications but stated that when he was taking vitamins, the victim asked for one, and he gave her one. According to the defendant, when he was awakened by his alarm clock the next morning, the victim was on top of him, and it "freaked [him] out." He explained that his first reaction was to get her off of him and then he had a conversation with her. The defendant said that he told the victim, "this is not right" and that "[she] shouldn't be doing this." He testified that an incident of that nature had never occurred before that morning.

Detective Messina scheduled a recorded interview of the victim for January 24, 2017, at the Children's Advocacy Center, in which the victim again made consistent claims against the defendant. The victim stated that she was taken to the hospital because "[her sister's] dad was being nasty." She specifically added that close to nighttime, the defendant (Smiley) gave her a green vitamin and two little white "powdery pills" that he told her would get rid of acne, and she fell asleep. When she woke up, she was in the defendant's room, in his bed, wearing a shirt and no underwear, and the defendant was "touching all over [her] and stuff." When asked to specify where the defendant was touching her, the victim pointed to the vaginal area of a diagram, stated that she called it "a private part," and described how the defendant used his "boy part" to touch her private part. She confirmed that the term "boy part" was a reference to the defendant's penis.

According to the victim, "it was just rubbing down there," on top of her private part, and she specifically denied that it had been inside of her private part. When asked how it felt, she stated that it felt weird. When asked about the rest of the defendant's body, she explained it was close to her, that she was on her side and the defendant was behind her. The victim further stated that she felt uncomfortable and dizzy.

After the defendant got dressed for work and left, the victim went to her sister's room and texted a friend from school who told her to call 911. The victim said that she first called her aunt, and then called 911 and told them she was raped. When asked what "raped" meant, the victim stated that rape was "what Mr. Smiley did" to her. She stated that she was shocked and that she did not understand why the defendant would do this to her.

The victim was subsequently interviewed on February 14, 2017, by Dr. Jamie Jackson of the Audrey Hepburn Care Center of the Children's Hospital. At that time the victim again made consistent detailed claims against the

foreign to the victim obtained from swabs from the victim's neck, ear, fingernails, as well as from the hip areas and crotch of the victim's panties, was consistent with the defendant's DNA profile." SCR, Vol. 7, pp. 20-21.

---

defendant, specifically stating that the defendant had given her pills the night before the incident, when she woke up, she was only wearing a shirt, the defendant's "boy parts" were "rubbing up against" her "girl parts," and that it lasted for "maybe about three minutes" before the defendant got up to go to work. However, at trial, the victim, who was then fifteen years old, identified the defendant in court as her sister's dad, but would not respond to other questions, such as whether she had been at the defendant's house or whether she remembered the last time she saw the defendant. When asked if there was anything she wanted to say, she stated, "Uhm... the truth is that it wasn't him in that — it was all my fault. And the only reason I ever called the police in the first place is because — that I was scared I would get in trouble, and I didn't know that all of this would have happened, and I'm sorry, I guess." When asked why she thought it was her fault, she stated, "It's my fault because I said it was, and that's the truth, and that's all I'm going to say, so stop asking me questions." When asked if anyone told her what to say at trial, she stated, "No, and that's the truth. Okay, that's the truth. Is everyone listening, because I said it's the truth." The State tendered the victim for cross-examination, but the defense attorney declined to question the victim, and she was released from her subpoena.

Natasha Poe of the St. Tammany Parish Coroner's Office, accepted as an expert witness in DNA analysis, also testified at trial. Poe tested the contents of the victim's sexual assault kit, the green t-shirt, and a reference sample from the defendant. Chemical presumptive tests for the presence of semen performed on swabs of the victim's genitalia, perineum, inner thigh, the crotch of the victim's panties, and portions of the green t-shirt were all positive. During confirmation testing, spermatozoa were identified on the crotch of the victim's panties and on the back of the green t-shirt, confining the presence of semen. The sperm fraction of one half of each anal swab produced a profile consistent with the defendant's DNA profile and a haplotype consistent with the defendant's haplotype. The sperm fraction of one-half of each perineum swab produced a DNA profile consistent with the defendant's DNA profile and a haplotype consistent with the haplotype obtained from the swab of the defendant. A DNA profile foreign to the victim obtained from swabs from the victim's neck, ear, fingernails, as well as from the hip areas and crotch of the victim's panties, was consistent with the defendant's DNA profile. The swabs from the victim's fingernails, the epithelial and sperm fractions from the crotch of the victim's panties, and the hip areas of the victim's panties produced haplotypes consistent with the haplotype obtained from the swab of the defendant.

*State v. Sexton*, 20-0682 (La. App. 1 Cir. 4/16/21), 2021 WL 1440028, at *1-2.

4.      **Overview of the petitioner's claims.**

Sexton raises ten claims, which may be broadly characterized as follows:

-       the trial court lacked impartiality (Claim 9);

-       prosecutorial misconduct and/or ineffective assistance of counsel with respect to the admission of evidence during the prosecution's case-in-chief (Claims 1, 2, 3, 4, 5, 7)

-       ineffective assistance of counsel arising from the performance of defense counsel in presenting the defendant's case (Claims 6, 8, 10).

## PROCEDURAL HISTORY

1.      **Proceedings in the state courts.**

A.      **Proceedings leading to conviction and sentence.**

The district attorney, on June 1, 2017, charged petitioner Jinel Sexton with one counts sexual battery of a juvenile under the age of thirteen.[2]

The trial was held from October 22-25, 2017, and resulted in a verdict of guilty as charged.[3] The petitioner subsequently admitted to being a second felony offender, and the trial court imposed a sentence of fifty years at hard labor with the first twenty-five years to be served without benefit of parole.[4]

B.      **Direct review proceedings.**

The First Circuit Court of Appeal affirmed the defendant's convictions and sentences on April 16, 2021. *State v. Sexton*, 20-0682 (La. App. 1 Cir. 4/16/21), 2021 WL

---

2   State Court Record, Volume 1, pg. 62.

3   See SCR, Vol. 1, pp. 45-57 (minute entries) & *id*. at 215-219 (evidence receipts and verdict form); SCR, Vols. 2-4 (trial transcripts).

4   SCR, Vol. 1, pp. 58-59 (minute entry); SCR, Vol. 4, pp. 200-209 (transcript).

1440028.[5] Sexton timely applied for supervisory review with the Louisiana Supreme

Court.[6] The Louisiana Supreme Court denied writs on September 27, 2021. *State v.*

*Sexton*, 21-0671 (La. 9/27/21), 325 So.3d 82.[7]

Sexton did not seek certiorari review from the United States Supreme Court.[8]

### C.    Collateral review proceedings.

Sexton applied for post-conviction relief on August 5, 2022.[9] The trial court

denied relief by written order dated December 6, 2022.[10] Sexton timely applied for

supervisory review from both the First Circuit Court of Appeal and the Louisiana

Supreme Court; his applications for review were ultimately denied on January 17,

2024. *State v. Sexton*, 23-0122 (La. App. 1 Cir. 4/24/23), 2023 WL 3058327; *State v.*

*Sexton*, 23-0500 (La. App. 1 Cir. 7/28/23), 2023 WL 4842840, *writ denied*, 23-01178

(La. 1/17/24), 377 So.3d 234.[11]

### 2.    Proceedings in this Court.

The instant habeas corpus petition is undated and was mailed to this Court on

July 5, 2024.[12]

---

5  SCR, Vol. 7, pp. 16-28.

6  SCR, Vol. 6, pp. 1-22.

7  SCR, Vol. 6, pp. 102-103.

8  Rec. Doc. 3, pg. 3 (Answer to Question 9h).

9  SCR, Vol. 6, pp. 30-63.

10 SCR, Vol. 6, pp. 69-86.

11 SCR, Vols. 8-9.

12 See Rec. Doc. 3, pp. 15, 38

<u>TIMELINESS</u>

The habeas corpus petition is timely.[13]

<u>EXHAUSTION AND PROCEDURAL DEFAULT</u>

The petitioner's claims are exhausted and not in procedural default.[14]

<u>MERITS REVIEW</u>

Sexton's claims were adjudicated on the merits. They are for that reason subject to AEDPA deference. 28 U.S.C. § 2254(d); *see also, e.g., Langley v. Prince*, 926 F.3d 145, 155-156 (5th Cir. 2019) (en banc).

The respondent notes at the outset that it addresses the petitioner's claims in an order other than the order the claims have been presented to the Court. The respondent first addresses the claim that the trial court judge should have been recused. Then respondent addresses the claims arising from the introduction of evidence during the prosecution's case-in-chief. Finally, the respondent addresses the claims arising from counsel's conduct during the petitioner's case-in-chief.

---

13 The petitioner exhausted right to direct review in the state court system when the Louisiana Supreme Court denied writs on September 27, 2021. He did not seek further review from the United States Supreme Court, so the one-year period of limitations commenced to run ninety days later, on December 27, 2021. The period of limitations was tolled from the date he filed his application for post-conviction relief (August 5, 2022) until it was resolved finally (January 17, 2024).

The petitioner expended two hundred twenty-one (221) days of the one-year period available to him before filing his application for post-conviction relief; as a result, he had one hundred forty-four (144) days remaining when the period of limitations began to run again. That means he had until June 10, 2024 to file his petition. The instant habeas corpus petition is undated, but bears a clerk of court stamp indicating that it was tendered for filing on June 6, 2024 (Rec. Doc. 3, pg. 2, lower right quadrant of page). It was therefore timely filed.

14 The state district court found that several of the petitioner's claims *were* procedurally defaulted, but the Louisiana Supreme Court ruled on the merits of all of the petitioner's claims. *Compare* SCR, Vol. 7, pg. 74 *with* SCR, Vol. 9, pg. 111. The Louisiana Supreme Court's decision to address the merits of the claims served to remove the procedural bar applied by the district court. *See* <u>Rhoades v. Davis</u>, 914 F.3d 357, 372 (5th Cir. 2019) ("if the last state court presented with a particular federal claim reaches the merits, that decision removes the procedural bar to federal court review").

1.    **The claim that the state district court judge lacked impartiality (Claim 9).**

The details of this claim.

The petitioner alleges that the trial court judge, Scott Gardner, should not have presided over his case for two reasons. The first is "his previous involvement in a disciplinary hearing favoring my counsel;" the petitioner claims that "Judge Gardner testified regarding the performance and character of Mr. Mecca in a disciplinary context." The second is "his membership in the Louisiana Foundation Against Sexual Assaults." Rec. Doc. 3, pp. 31-32.

The petitioner relatedly asserts ineffective assistance on the part of his trial counsel for failing to move to recuse the judge. Rec. Doc. 3, pp. 31.

Additional pertinent context facts.

The petitioner's counsel did not move to recuse the trial court judge, and the trial court judge did not self-recuse.

The petitioner presented evidence that his attorney was disciplined by the Louisiana Supreme Court in 2017. SCR, Vol. 8, pp. 219-223. See In re Mecca, 16-1116 (La. 1/20/17), 214 So.3d 827 (published opinion of the Louisiana Supreme Court imposing one-year suspension). The opinion imposing discipline reflects that Mr. Mecca was arrested for possession with intent to distribute marijuana, that he self-reported his arrest, and that he was subsequently admitted to an inpatient drug treatment program. 214 So.3d at 827-828. At the hearing committee level, "Judges Scott Gardner and Raymond Childress of the 22nd JDC both testified on respondent's behalf that he has been attentive to his clients, shown excellent skills

in his representation, and been respectful to the court and opposing counsel since he has been discharged [from inpatient treatment]." Id. at 830. The state district court, in addressing this claim, reasoned that the evidence presented by the petitioner "establishes that Judge Gardner testified in favor of Mecca" and that there was "no evidence of any animus the judge might have had against Defendant himself." SCR, Vol. 7, pg. 83.

The petitioner also presented a *Ballotpedia*[15] entry concerning Scott Gardner. The entry lists "Awards and Associations," and among the "Associations" are "Member, Louisiana Foundation Against Sexual Assault." SCR, Vol. 8, pg. 224. It appears from the top left hand corner of the printout of the *Ballotpedia* entry that it was printed on May 25, 2023. *Id*. The state district court, in addressing this claim, stated: "Defendant offers no support for his statement that at the time of trial, the Judge was a member of the Louisiana Foundation Against Sexual Assaults." SCR, Vol. 7, pg. 83.

<u>The adjudication of this claim by the state courts.</u>

The last reasoned state court decision to address this claim reads as follows:

> Applicant fails to show that he received ineffective assistance of counsel under the standard of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). With respect to his remaining claims, he fails to meet his post-conviction burden of proof. La.C.Cr.P. arts. 930.2.

*State v. Sexton*, 23-01178 (La. 1/17/24), 377 So.3d 234, 234.

---

15 Ballotpedia is 501(c)(3)( charitable nonprofit organization that describes itself as "the digital encyclopedia of American politics," http://ballotpedia.org/Ballotpedia:About.

<u>The adjudication is not contrary to, or an unreasonable application of, clearly established federal law.</u>

a.    The petitioner is not entitled to relief unless he demonstrates that the state court's adjudication of his claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

The clearly established federal law governing the defendant's recusal claim is:

> Under the Due Process Clause, a criminal defendant is guaranteed the right to a fair and impartial tribunal. *Bracy v. Gramley*, 520 U.S. 899 (1997). The Due Process Clause "establishes a constitutional floor, not a uniform standard." *Id*. This floor requires a fair trial, "before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Id*. (citation omitted).
>
> However, "bias by an adjudicator is not lightly established." *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1052 (5th Cir.1997). Courts ordinarily "presume that public officials have properly discharged their official duties." *Bracy v. Gramley*, 117 S.Ct. at 1799 (internal quotation marks and citations omitted). General allegations of bias or prejudice are insufficient to establish a constitutional violation. *See Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813 (1986) (holding that general allegations of a judge's frustration with insurance companies are not sufficient to force recusal under the Due Process Clause from a case in which an insurance company was a party). The Supreme Court has stated that "most matters relating to judicial disqualification [do] not rise to a constitutional level." *Id*. at 1584 (quoting *FTC v. Cement Inst.*, 333 U.S. 683 (1948)). So even if a judge is disqualified under state or federal law, the disqualification is not always required by the Due Process Clause. See *id*. at 1585.
>
> In general, the Supreme Court has recognized "presumptive bias" as the one type of judicial bias other than actual bias that requires recusal under the Due Process Clause. *Buntion [v. Quartermann]*, 524 F.3d [664 (5th Cir. 2008)] at 672.

> Presumptive bias occurs when a judge may not actually be biased, but has the appearance of bias such that "the probability of actual bias ... is too high to be constitutionally tolerable." Id. (quoting *Withrow v. Larkin*, 421 U.S. 35 (1975)). The Supreme Court has only found that a judge's failure to recuse constitutes presumptive bias in three situations: (1) when the judge "has a direct personal, substantial, and pecuniary interest in the outcome of the case," (2) when he "has been the target of personal abuse or criticism from the party before him," and (3) when he "has the dual role of investigating and adjudicating disputes and complaints." *Buntion*, 524 F.3d at 672 (quoting *Bigby v. Dretke*, 402 F.3d 551, 559 (5th Cir.2005)); see also *Crater v. Galaza*, 491 F.3d 1119, 1131 (9th Cir.2007) (coming to the same conclusion).

*Richardson v. Quarterman*, 537 F.3d 466, 474-475 (5th Cir. 2008).

The defendant offered no proof of actual bias by the state district court judge, and his allegations do not come anywhere near establishing a basis for presuming bias on the part of the state district court judge.

b.     The clearly established federal law governing this comes from *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires the petitioner to show "deficient performance" and "prejudice."

The petitioner shows no plausible basis for concluding that trial counsel performed deficiently or that he was prejudiced. The petitioner failed to present grounds which could conceivably result in the recusal of the state district court judge.

2.     **The claims concerning the victim's urine drug screening results (Claim 2, Claim 4).**

The details of these claims.

*Claim 2.*      The petitioner alleges "prosecutorial misconduct for failing to provide *Brady* material relative to victim's drug screen." He claims that "[t]he state acknowledged but did not provide the urine screen results indicating the presence of drugs accessible the alleged victim at her relatives' homes" and that "[t]he specific drugs found in the victim's system, which were suppressed, could have countered the state's narrative and explained the victim's behavior." Rec. Doc. 3, pp. 7, 16.

*Claim 4.*      The petitioner's fourth claim is one of ineffective assistance of counsel. He argues that the analysis of the victim's urine "contradicts the State's argument and Dr. Jamie Jackson's testimony that I only gave temazepam to the victim" and "could have supported our assertion that the victim's behavior was influenced by medications she accessed at her mother's and grandmother's homes." Rec. Doc. 3, pp. 10, 17-18.

Additional pertinent context facts.

a.      The victim after calling 911 reported that the defendant gave her pills and that she felt "uncomfortable and dizzy" upon awakening. *See State v. Sexton*, 20-0682 (La. App. 1 Cir. 4/16/21), 2021 WL 1440028, at *1-2. She was taken to hospital, and in order to diagnose and treat the victim, doctors ordered urine drug screening. *See* SCR, Vol. 7, pp. 111-112, 149-150 (copies of documentation reflecting test results).

The results were contained in the records from both St. Tammany Parish Hospital and the Audrey Hepburn Care Center at Children's Hospital. Both sets of

medical records were tendered to defense counsel prior to trial and were introduced into evidence at the trial. The fact that the records were tendered to defense counsel is evident from both the pre-trial motion practice and the trial transcript.

b.      Prior to trial, defense counsel filed a motion in limine asking to exclude evidence of the presumptive positive test results on the grounds that they were insufficiently reliable. SCR, Vol. 7, pp. 108-112, particularly *id*. at pg. 108-109 ("The presumptive positive drug test result reports from the St. Tammany Parish Hospital and the Children's Hospital, and attached hereto as defendant's exhibits D-1 and D-2 respectively, given written notice that tests performed merely represent presumptive positive results..."). The fact that defense counsel attached pertinent portions of the medical records as exhibits to a pre-trial motion is evidence that the medical records were disclosed to defense counsel prior to trial.

c.      The defendant's motion in limine was addressed prior to trial. The state court record reflects that defense counsel said "[t]here are lab reports that say they're presumptive tests and not confirmations, and I just need someone to tell me whether there were confirmations, and if not, why not." The prosecutor said: "There are confirmations in the medical records." Defense counsel said: "I didn't see any." The prosecutor said: "We'll point them out for you." Defense counsel then said, "If you point that out, I'll be happy to look at that and withdraw that motion if that's the case." SCR, Vol. 1, pp. 252.

d.      During trial, the medical records from St. Tammany Parish Hospital were introduced into evidence as Exhibit S-16 and the medical records from

Children's Hospital New Orleans were introduced as Exhibit S-25. SCR, Vol. 3, pp.

149, 179. The records were introduced *without objection,* SCR, Vol. 3, 149, lines 29-30

& *id*. at pg. 179, lines 25-26, which is further circumstantial evidence that they in

fact had been tendered to defense counsel prior to trial.

The results of the urine drug screen—specifically, that benzodiazepines were

detected—was discussed during the testimony of pediatrician Jamie Jackson. *See*

SCR, Vol. 4, pp. 54-55 & 58-60. Dr. Jackson testified that the preliminary test results

were the ones done by Children's Hospital, *see* SCR, Vol. 4, pg. 60, line 2 (testimony)

& SCR, Vol. 7, pg. 112 (actual test results), and that the confirmation testing was

done by an outside laboratory called "ARUP," *see* SCR, Vol. 4, pg. 59, lines 17-26 &

SCR, Vol. 7, pp. 149-150 (actual test results).

e.    In addressing the petitioner's *Brady* claim, the state district court

reasoned as follows:

> Defendant asserts a *Brady* violation claiming that the State
> withheld evidence of a portion of the victim's Children's Hospital
> urine drug screen. He quotes an exchange between counsel
> occurring before jury selection relative to a "confirmation test."
> Counsel for the State maintained that the evidence was
> contained in the Children's records and offered to point it out to
> [petitioner's trial counsel, Jim Mecca]. Mecca admitted that he
> had received the Children's records but hadn't seen the
> confirmation. <u>That is, the State had not withheld the
> confirmation test.</u> Mecca had merely overlooked it. Dr. Jamie
> Jackson, who examined the victim during her interview at the
> AHCC pointed out the confirmation test for Mecca and the jury.

SCR, Vol. 7, pp. 74-75 (emphasis supplied).

f.      The above-described confirmation test indicated the presence of the following metabolites in the victim's urine:

- alpha-hydroxyalprazolam, >1000 ng/mL
- alprazolam, 267 ng/mL
- diazepam, 161 ng/mL
- nordiazepam, 24 ng/mL
- oxazepam, >4000 ng/mL
- temazepam, >4000 ng/mL.

SCR, Vol. 7, pp. 149-150.

These results are consistent with the consumption of three different benzodiazepines: (1) temazepam, a prescription medication sold under the brand name Restoril, which is metabolized to oxazepam; (2) alprazolam, a prescription medication sold under the brand name Xanax, which is metabolized to alpha-hydroxyalprazolam; and (3) diazepam, a prescription medication sold under the brand name Valium, which is metabolized to nordiazepam.[16]

g.      During the course of the investigation, the St. Tammany Sheriff's Office executed a search warrant at the defendant's residence. *See* SCR, Vol. 3, pp. 157-159 (trial testimony of Detective Messina); SCR, Vol. 8, pp. 199-201 (copy of search warrant). They located, among other things, a bottle containing sixteen pills of temazepam that had been prescribed to the petitioner's girlfriend Erica Hemphill. This bottle was recovered from a dresser in the petitioner's bedroom, next to his bed. SCR, Vol. 3, pp. 164-166 (testimony of Detective Messina). *See also* SCR, Vol. 4, pp. 89, 92-93 (testimony of Erica Hemphill).

During argument to the jury the prosecution argued that it was not "a

---

16 There is no evidence of this in the record. The undersigned counsel has determined this by informal consultation with Google.

coincidence" that (1) the victim reported being given pills by the petitioner, and (2) a benzodiazepine called temazepine was recovered from the petitioner's bedroom, and (3) that temazepine was detected in the victim's urine. SCR, Vol. 4, pp. 176-177.

No evidence was presented by either the prosecution or the defense to attempt to explain the presence of alprazolam (Xanax), diazepam (Valium), or the metabolites of those drugs (alpha-hydroxyalprazolam, nordiazepam) in the victim's urine.

h.    In addressing the petitioner's application for post-conviction relief, the state district court noted:

> [The petitioner] seems to argue that the victim could have obtained <u>other</u> drugs, specifically, Valium and Xanax from her Mother or Grandmother, who he claims had prescriptions. He contends that it was the State's obligation to provide evidence of those prescriptions. In this pleading [i.e., the application for post-conviction relief] he has failed to offer any proof of those alleged prescriptions.

SCR, Vol. 7, pg. 75.[17]

<u>The adjudication of this claim by the state courts.</u>

The last reasoned state court decision to address this claim reads as follows: "Applicant fails to show that he received ineffective assistance of counsel under the standard of Strickland v. Washington, 466 U.S. 668 (1984). With respect to his remaining claims, he fails to meet his post-conviction burden of proof. La.C.Cr.P. arts. 930.2." *State v. Sexton*, 23-01178 (La. 1/17/24), 377 So.3d 234, 234.

---

17 The respondent notes that the petitioner presented evidence that the victim's mother was prescribed Xanax (alprazolam) in 2018 and 2019 (SCR, Vol. 8, pg. 193), but the offense occurred in 2017.

<u>The adjudication is not contrary to, or an unreasonable application of, clearly established federal law.</u>

The petitioner is not entitled to relief unless he demonstrates that the state court's adjudication of his claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

a.    The "clearly established Federal law" governing the petitioner's prosecutorial misconduct claim—<u>Claim 2</u>—comes from *Brady v. Maryland*, 373 U.S. 83 (1963). The *Brady* line of jurisprudence requires a petitioner to "show that (1) the prosecution suppressed evidence, (2) the evidence was favorable to the defense, and (3) the evidence was material to his guilt or punishment." *Mahler v. Kaylo*, 537 F.3d 494, 500 (5th Cir.2008).

Here, the petitioner failed to show that the prosecution suppressed evidence. The petitioner plainly had the preliminary urine screen results prior to trial as evidenced by the fact that the petitioner's counsel filed a motion in limine prior to trial seeking a ruling on the admissibility of those urine screen results. SCR, Vol. 7, pp. 108-112. The state district court, during post-conviction proceedings, made an express factual findings that the state had not suppressed the urine screen confirmation results. This factual finding is presumed correct, 28 U.S.C. § 2254(e)(1), and is consistent with the state court record.

Because the state courts found that the urine test results at issue were not suppressed, the state courts did not unreasonably apply clearly established federal

law in rejecting the petitioner's *Brady* claim.

b.      The clearly established federal law governing the related ineffective assistance of counsel claim—<u>Claim 4</u>—comes from *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires the petitioner to show "deficient performance" and "prejudice."

The defendant argues that the results contradict the prosecution's theory "that I only gave temazepam to the victim" (Rec. Doc. 3, pg. 10) and "could have significantly impacted the defense strategy" (Rec. Doc. 3, pg. 10) because it "could have supported our assertion that the victim's behavior was influenced by medications she accessed at her mother's and grandmother's homes" (Rec. Doc. 3, pp. 17-18).

The petitioner argued at trial that he was completely without fault in the events leading to his arrest and prosecution—"He's awakened by the alarm clock. He sleeps like a brick because he works hard in construction, and he finds her on him and he has no clue what's going on." SCR, Vol. 4, pg. 171 (closing argument); *see also* SCR, Vol. 4, pp. 114-115 (trial testimony of petitioner). The petitioner now claims that the presence of other, unexplained benzodiazepines in the victim's system would have bolstered his claim that he was without fault.

The petitioner's burden under *Strickland* includes the requirement that he show "prejudice," which is a " 'substantial, not just 'conceivable,' likelihood of a different result." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (citation omitted).

As noted in argument to the jury, "[t]his little girl was literally covered,

covered in this grown man's DNA and semen from her ears to her knees." SCR, Vol. 4, pg. 154, lines 9-11. *Cf. State v. Sexton*, 20-0682 (La. App. 1 Cir. 4/16/21), 2021 WL 1440028, at *2 (summary of scientific evidence, reproduced in the margin).[18] The petitioner's argument is the victim was not *only* under the influence of temazepam (Restoril), but *also* under the influence of alprazolam (Xanax) and nordiazepam (Valium). Accepting the petitioner's trial testimony would require the factfinder to believe that (1) a twelve year old girl under the influence of multiple benzodiazepines climbed into the petitioner's bed and did something to cause him to ejaculate and otherwise deposit genetic material all over her body, and (2) she did this in a manner that *did not cause the petitioner to wake up.*

Because this is patently absurd, the decision of the state courts finding that the petitioner failed to meet his burden under *Strickland v. Washington* was not contrary to, or an unreasonable application of, clearly established federal law.

---

18 "Chemical presumptive tests for the presence of semen performed on swabs of the victim's genitalia, perineum, inner thigh, the crotch of the victim's panties, and portions of the green t-shirt were all positive. During confirmation testing, spermatozoa were identified on the crotch of the victim's panties and on the back of the green t-shirt, confining the presence of semen. The sperm fraction of one half of each anal swab produced a profile consistent with the defendant's DNA profile and a haplotype consistent with the defendant's haplotype. The sperm fraction of one-half of each perineum swab produced a DNA profile consistent with the defendant's DNA profile and a haplotype consistent with the haplotype obtained from the swab of the defendant. A DNA profile foreign to the victim obtained from swabs from the victim's neck, ear, fingernails, as well as from the hip areas and crotch of the victim's panties, was consistent with the defendant's DNA profile. The swabs from the victim's fingernails, the epithelial and sperm fractions from the crotch of the victim's panties, and the hip areas of the victim's panties produced haplotypes consistent with the haplotype obtained from the swab of the defendant."

### 3.   The claims concerning the t-shirt worn by the victim at the time of the offense (Claim 3, Claim 5).

The details of these claims.

*Claim 3.*       The petitioner alleges "prosecutorial misconduct" from the "introduction of 'false evidence' in the form [of] the t-shirt seized at crime scene." Rec. Doc. 3, pg. 8. He asserts that a "misrepresentation of evidence" occurred because the case detective, Carli Messina, "initially claimed the shirt was gray but later described it as green with gray writing." *Id.* The petitioner also argues that "[t]he prosecution did not confirm that the shirt presented belonged to the victim, casting doubt on its relevance and authenticity." Rec. Doc. 3, pg. 17.

*Claim 5.*       The petitioner alleges ineffective assistance of counsel for failing to investigate the t-shirt. He says that the t-shirt belonged to his girlfriend, and that neither he nor his girlfriend realized this until it was actually introduced into evidence at trial. He argues that, had he known this, sooner it "could have been crucial in challenging the admissibility of the T-shirt." Rec. Doc. 3, pp. 19-20.

Additional pertinent context facts.

a.       The detective assigned to investigate the case was Carli Messina. After the victim reported the sexual assault and was taken to hospital, Detective Messina visited her at the hospital and spoke to her. SCR, Vol. 3, pp. 145-149. Detective Messina testified that "[s]he said she was wearing a *gray* t-shirt with some sort of green writing on it." SCR, Vol. 3, pg. 147, lines 18-19 (emphasis supplied).

Detective Messina participated in the execution of the search warrant at the petitioner's residence. SCR, Vol. 3, pp. 158-167. Among the evidence she collected

was a t-shirt. SCR, Vol. 3, pp. 165-166. She described that shirt for the jury as "a *green* t-shirt with gray Mountain Dew writing." SCR, Vol. 3, pg. 166, lines 3-4 (emphasis supplied); see also SCR, Vol. 4, pg. 16, lines 5-9.

The t-shirt was examined scientifically. See SCR, Vol. 3, pg. 19, lines 10-12 (testimony of crime lab technician Natasha Poe identifying t-shirt she examined). Particularly, cuttings of the t-shirt were chemically tested, and that testing yielded presumptive positive results for semen, definitive results for prostate-specific antigen, and definitive results for the presence of spermatozoa. SCR, Vol. 3, pp. 20-22 (testimony of Natasha Poe); *see also* SCR, Vol. 1, pp. 129-134 (copy of Natasha Poe's scientific analysis report that was introduced at trial as Exhibit S-3).[19] The only identifiable DNA recovered from the t-shirt was that of the victim.[20]

The record reflects that the jury was shown photographs of the t-shirt before it was taken into evidence. SCR, Vol. 3, pg. 165, lines 14-20. The record also reflects that the t-shirt itself was introduced into evidence. SCR, Vol. 3, pp. 165-166.

---

19 To be precise, there were three cuttings taken from the t-shirt: two from the front and one from the back. *See* SCR, Vol. 1, pg. 130 (identifying "a portion of stain T2 from front of shirt", "a portion of stain T6 from front of shirt," and "a portion of stain T8 from back of shirt").

All three cuttings tested presumptively positive for semen and tested positive for prostate-specific antigen. SCR, Vol. 1, pg. 130-131, ¶¶ 6-7. Spermatozoa were identified on the cutting from the back of the shirt, but not on the two cuttings from the front of the shirt. *Id.*, ¶¶ 10-11.

20 The lab technician attempted to develop DNA profiles from both the "sperm fraction" of the stains and the "epithelial fraction" of the stains.

The sperm fraction portion of two of the stains "failed to produce profiles due to insufficient or excessively degraded DNA;" the sperm fraction portion of the third stain produced "low level" profiles that "were not suitable for comparison purposes." SCR, Vol. 1, pp. 131, ¶¶ 15-16.

The epithelial fraction portion of all three stains produced profiles. SCR, Vol. 1, pp. 131, ¶ 14. Two of the profiles were "consistent with each other and with the profile obtained from [the victim]" (SCR, Vol. 1, pg. 133, ¶ 36); the third "produced a partial profile consistent with a mixture of at least two individuals" from which "no conclusions could be made" (SCR, Vol. 1, pg. 134, ¶ 40).

b.      The petitioner's girlfriend, Kathy Hebert, testified at trial. SCR, Vol. 4, pp. 70-85. She testified that she had a t-shirt similar to the one reportedly worn by the victim at the time of the offense—"I did have a t-shirt with Mountain Dew on it, but I can't say it was definitely mine." She testified that she "could have" left that t-shirt at the petitioner's residence, since she left clothes there. SCR, Vol, 4, pg. 76, lines 2-12.

<u>The adjudication of this claim by the state courts.</u>

The last reasoned state court decision to address this claim reads as follows: "Applicant fails to show that he received ineffective assistance of counsel under the standard of *Strickland v. Washington*, 466 U.S. 668 (1984). With respect to his remaining claims, he fails to meet his post-conviction burden of proof. La.C.Cr.P. Arts. 930.2." *State v. Sexton*, 23-01178 (La. 1/17/24), 377 So.3d 234, 234.

<u>The adjudication is not contrary to, or an unreasonable application of, clearly established federal law.</u>

The petitioner is not entitled to relief unless he demonstrates that the state court's adjudication of his claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

a.      The clearly established federal law applicable to the "false evidence" claim—<u>Claim 3</u>—comes from *Napue v. Illinois*, 360 U.S. 264 (1959), which holds that "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Id*. at 269. To establish entitlement to relief, the petitioner must show "(1) the statements in

question are shown to be actually false; (2) the prosecution knew that they were false; and (3) the statements were material." *United States v. O'Keefe*, 128 F.3d 885, 893 (5th Cir. 1997).

Here, Detective Messina relayed a statement of the victim indicating that she was wearing a gray t-shirt with some sort of green writing on it" (SCR, Vol. 3, pg. 147, lines 18-19) but testified that the t-shirt she collected as evidence was "a green t-shirt with gray Mountain Dew writing" (SCR, Vol. 3, pg. 166, lines 3-4). The jury was shown photographs of the t-shirt at the time of its collection (SCR, Vol. 3, pg. 165, lines 14-20). The petitioner failed to show that Detective Messina testified falsely. He also fails to show how testimony about the color of the t-shirt (which again was actually viewed by the jury) could possibly be "material" in light of the other evidence of guilt. The state courts did not unreasonably apply clearly established federal law when it found this claim to be unmeritorious.

b.      The clearly established federal law governing the related ineffective assistance of counsel claim—Claim 5—comes from *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires the petitioner to show "deficient performance" and "prejudice."

The petitioner alleges that the t-shirt collected into evidence was actually his girlfriend's t-shirt, and that this would somehow have provided his attorney a basis for challenging the admissibility of the t-shirt. The petitioner, however, fails to articulate *how* the admissibility of the t-shirt could have been challenged.

Louisiana law provides that "[t]he requirement of authentication or

identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." La. C.E. art. 901(A). Here, the prosecution alleged that the t-shirt was worn by the victim, and the evidence introduced at trial showed that DNA consistent with the victim was recovered from cuttings taken from two separate portions of the front of the t-shirt. *See* SCR, Vol. 1, pp. 131, ¶ 14 (copy of Natasha Poe's scientific analysis report that was introduced at trial as Exhibit S-3).

The state courts did not unreasonably apply clearly established federal law when it found this claim to be unmeritorious.

### 4. The claim concerning the admission of the victim's pre-trial statements (Claim 7).

The details of this claim.

The petitioner's Claim 7 concerns the introduction of two recorded statements of the victim: a Children's Advocacy Center ("CAC") recording and a statement made to a healthcare provider during the course of a forensic medical examination. He argues that the prosecution failed to meet the requirements for the admission of the CAC recording and that defense counsel was ineffective for failing to object to the introduction of both the CAC recording and the medical audio. He also appears to raise a challenge under the Confrontation Clause. Rec. Doc. 3, pp. 25-27.

Additional pertinent context facts.

During the investigation, the victim was taken to Children's Hospital. While there, at the request of the treating physician, she verbally provided a history of what happened to her. The treating physician, Dr. Jamie Jackson, explained to the

jury that "it's important for me to know for medical diagnosis and treatment, what things may have happened to the child." SCR, Vol. 4, pg. 36, lines 22-26. The conversation between the victim and the treating physician was audiorecorded, and that recording was played for the jury without objection. SCR, Vol. 4, pp. 37-38 (introduction of Trial Exhibit S-28).

Later in the investigation, the victim was forensically interviewed at a Children's Advocacy Center pursuant to state law. See La. R.S. 15:440.1 *et seq.*; SCR, Vol. 3, pp. 171-175. The recorded interview was played for the jury without objection. SCR, Vol. 3, pp. 175, 178 (introduction of Trial Exhibit S-23).

<u>The adjudication of this claim by the state courts.</u>

The last reasoned state court decision to address this claim reads as follows: "Applicant fails to show that he received ineffective assistance of counsel under the standard of *Strickland v. Washington*, 466 U.S. 668 (1984). With respect to his remaining claims, he fails to meet his post-conviction burden of proof. La.C.Cr.P. Arts. 930.2." *State v. Sexton*, 23-01178 (La. 1/17/24), 377 So.3d 234, 234.

<u>The adjudication is not contrary to, or an unreasonable application of, clearly established federal law.</u>

The clearly established federal law governing this comes from *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires the petitioner to show "deficient performance" and "prejudice."

Louisiana law contains a hearsay exception for "statements for purposes of medical treatment and medical diagnosis in connection with treatment." La. C.E. art.

803(4). It also more specifically permits the introduction of "a statement made by the victim of a sexually oriented criminal offense to a healthcare provider during the course of a forensic medical examination." La. C.E. art. 801(D)(1)(e). The statement the victim made to Dr. Jackson was admissible under both of these provisions of the Louisiana Code of Evidence.

Louisiana law also contains a hearsay exception for Children's Advocacy Center interviews. La. R.S. 15:440.5(A). The testimony at trial affirmatively established that the statutory prerequisites necessary to render the statement admissible were established. SCR, Vol. 3, pp. 174-175. Moreover, the victim was available to testify and did in fact testify. SCR, Vol. 3, pp. 129-133. The forensic interview was therefore admissible under this exception to the hearsay rule.

The petitioner fails to identify what objection to the admission of the evidence his attorney should have made. Regardless, there is no basis for concluding that any objection would have resulted in the exclusion of the evidence. Accordingly, the state courts did not unreasonably apply clearly established federal law when it found this claim to be unmeritorious.

Finally, to the extent that the defendant raises a Confrontation Clause claim, that claim is without merit because the victim appeared in court and testified: "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of [her] prior testimonial statements." *Crawford v. Washington*, 541 U.S. 36, 59 n. 9 (2004).

**5.     The claim concerning the admission of jail calls (Claim 1).**

The details of this claim.

The petitioner's first claim concerns the admission of telephone calls made by the defendant while he was incarcerated. He argues that the calls should not have been admitted at trial because, in his view, they were substantially more prejudicial than probative. Rec. Doc. 3, pp. 5, 16.

Additional pertinent context facts.

The victim was initially cooperative with law enforcement authorities. However, shortly before trial, both she and her mother ceased to be cooperative with law enforcement authorities. This sudden change in her cooperativeness coincided with telephone calls made by the defendant from jail.

The adjudication of this claim by the state courts.

The state district court allowed the evidence to be introduced. The Louisiana First Circuit Court of Appeal affirmed this decision. The Louisiana Supreme Court denied writs without comment.  The Court first summarized the applicable Louisiana statutes and jurisprudence, focusing on the jurisprudential rule that "[a]ctions by a defendant that are designed to prevent witnesses from testifying" is "admissible and relevant to show consciousness of guilt on the defendant's part and his desire to evade prosecution." *State v. Sexton*, 20-0682 (La. App. 1 Cir. 4/16/21), 2021 WL 1440028, at *3-4, discussing *State v. Burnette*, 353 So.2d 989 (La. 1977).

The Court then analyzed the introduction of the calls at length, and concluded:

> Considering the three-pronged analysis set forth by [*State v. Burnette*, 353 So.2d 989 (La. 1977)], we find that the jail calls were properly admitted. The content and timing of the jail calls seemingly indicate that the defendant was attempting to influence or have others influence initially what would happen during the victim's scheduled meeting with the assistant district attorney and subsequently as to whether or not the victim would continue to evade questioning and/or not appear at trial. The probative value of this evidence is substantial in that it was presented to explain the victim's recantation at trial of her consistent pretrial claims. Any prejudicial effect that might have existed was substantially outweighed by this probative value. Mindful that the defendant has not provided any other plausible explanation or context for the content of the jail calls to the contrary, we conclude that the trial court did not err or abuse its discretion in admitting the jail calls to show consciousness of guilt on the defendant's part and his desire to evade prosecution. We find no merit in the sole assignment of error.

*State v. Sexton*, 20-0682 (La. App. 1 Cir. 4/16/21), 2021 WL 1440028, at *3-6.

Because the Louisiana Supreme Court denied writs without comment, this discussion represents that last reasoned state court decision addressing the petitioner's claim.

<u>The adjudication is not contrary to, or an unreasonable application of, clearly established federal law.</u>

The petitioner alleges that the introduction of the telephone calls violated Articles 401-403 of the Louisiana Code of Evidence.

The clearly established federal law on point is that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991). This includes state law

determinations of whether evidence is relevant and whether it is more probative than prejudicial. <u>Fuller v. Johnson</u>, 114 F.3d 491, 497-498 (5th Cir. 1997).

This claim does not provide a basis for habeas corpus relief.

**6.   The claim arising from counsel's decision not to cross-examine the victim at trial (Claim 10).**

<u>The details of this claim.</u>

The petitioner argues that "[d]espite indications during opening statements that cross-examination would occur, my defense counsel did not question the alleged victim when she was tendered for cross-examination" and "the failure to cross-examine deprived the jury of crucial details about the incident and what transpired between the alleged victim and the defendant." Rec. Doc. 3, pp. 34-37.

<u>Additional pertinent context facts.</u>

a.   The victim testified at the trial. She stated her name and date of birth, what grade she was in, and who brought her to court. She also said she knew why she was in court and who the defendant was. SCR, Vol. 3, pp. 129-130. After that, she became non-responsive to the prosecutor's questioning:

Q:   Have you known him since you were a little girl?

A:   Yes.

Q:   Did you ever spend -- well, first of all, what's his name? How do you know him by?

A:   (No response.)

Q:   Can you say his name, or would you rather not say?

A:   I don't want to say it.

Q:   Okay. Okay. That's okay. Did you ever spend time over at his house?

A:   (No response.)

Q:   Is it hard for you to talk about him?

A:     Yes.

Q:     Do you remember the last time that you saw him?

       You can just answer yes or no.

A:     (No response.)

Q:     [JB], would you rather write your answers down on paper? Would that be better for you if you could write your answers down?

A:     (No response.)

PROSECUTOR:         Your Honor, may I approach the witness?

THE COURT:         Please.

Q:     I'm going to give you a piece of paper and a pen, okay. Do you think you can write your answers down for me?

A:     Okay.

Q:     Okay. Did you ever spend the night over at that man's house? And you can answer yes or no.

       Are you finished writing?

A:     No, I'm not.

Q:     Did you write anything?

A:     No, I didn't.

Q:     Is there anything you want to say?

A:     Yes.

Q:     Yes? You can say it.

A:     Uhm, so the truth is that -- the truth is that it wasn't him in that -- it was all my fault. And the only reason I ever called the police in the first place is because -- that I was scared I would get in trouble, and I didn't know that all of this would have happened, and I'm sorry, I guess.

Q:     Why is it your fault?

A:     Because.

Q:     Why is it your fault?

A:     (No response.)

Q:     Can you answer me why you think it's your fault?

A:     It's my fault because I said it was, and that's the truth, and that's all I'm going to say, so stop asking me questions.

Q:     Is there anything else that you want to say?

| A: | No, that's it. |
|---|---|
| Q: | Did anybody tell you what to say today? |
| A: | No, and that's the truth. Okay, that's the truth. Is everyone listening, because I said that's the truth. |
| Q: | We're listening. [JB], do you know any of those people over there [indicating]? |
| A: | Yes. |
| Q: | Who are they? |
| A: | His family. |

SCR, Vol. 3, pp. 131-133.

b.  The prosecutor then tendered the witness for cross-examination, at which time defense counsel said "[t]he defense has no questions." SCR, Vol. 3, pg. 133.

c.  Additional context for this claim is the jail calls by which the petitioner exerted pressure on the victim and which the state courts found relevant "to explain the victim's recantation at trial of her consistent pretrial claims." *State v. Sexton*, 20-0682 (La. App. 1 Cir. 4/16/21), 2021 WL 1440028, at *3-6.

d.  The state district court, in evaluating the petitioner's claim of ineffective assistance of counsel for failing to cross-examine the victim, reasoned: "The purpose of cross-examination is to discredit the witness or her testimony. The victim herself had given the best testimony Defendant could have hoped for. Cross examination would have done nothing to improve his chances and could have hurt them." SCR, Vol. 7, pg. 84.

<u>The adjudication is not contrary to, or an unreasonable application of, clearly established federal law.</u>

The clearly established federal law governing this comes from *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires the petitioner to show

"deficient performance" and "prejudice."

The decision not to cross-examine the victim in light of her testimony essentially recanting her prior statements was reasonable as a matter of trial strategy. The state courts did not unreasonably apply clearly established federal law when it found this claim to be unmeritorious.

### 7.   The claim that counsel to investigate petitioner's medical history (Claim 6).

The details of this claim.

In the petitioner's Claim 6, he says that that his attorney failed to investigate his "medical history of penile discharge" and that his medical records "which support these facts were not utilized in my defense due to insufficient investigation." Rec. Doc. 3, pp. 22-23.

Additional pertinent context facts.

a.    The petitioner testified at the trial. SCR, Vol. 4, pp. 98-138. He could have, but did not, mention any medical conditions which might explain "penile discharge." To the contrary, he claimed not to know how his DNA ended upon the victim. *See* SCR, Vol. 4, pg. 127, lines 19-22 ("Q: The DA is going to ask you how that child's DNA got -- how your DNA was found on her. Do you know? A: No.").

b.    In connection with the petitioner's application for post-conviction relief, he presented medical records from North Oaks Medical Center (Hammond) indicating that in December 2012 he complained of "sharp crampy right lower quadrant abdominal pain and noticed some clear discharge from the tip of his penis." SCR, Vol. 8, pg. 210. See also *Id*.,. pg. 205 (listing ICD-9 diagnosis codes

597.80, 788.7, and 789.03, which correspond to urethritis, unspecified; urethral discharge; and abdominal pain, right lower quadrant).[21]

The adjudication of this claim by the state courts.

The last reasoned state court decision to address this claim reads as follows: "Applicant fails to show that he received ineffective assistance of counsel under the standard of *Strickland v. Washington*, 466 U.S. 668 (1984). With respect to his remaining claims, he fails to meet his post-conviction burden of proof. La.C.Cr.P. Arts. 930.2." *State v. Sexton*, 23-01178 (La. 1/17/24), 377 So.3d 234, 234.

The adjudication is not contrary to, or an unreasonable application of, clearly established federal law.

The clearly established federal law governing this comes from *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires the petitioner to show "deficient performance" and "prejudice." Regarding the reasonableness of counsel's investigation, *Strickland* explains:

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.

466 U.S. at 691.

The petitioner alleges that counsel should have investigated his medical records but does *not* allege that he told his attorney about his history of penile discharge. The petitioner failed to prove deficient performance because he alleges no facts from which it may be concluded that this is something that counsel should have

21 See http://www.aapc.com/codify.

known to investigate.

The petitioner also fails to demonstrate prejudice. A single instance of seeking medical treatment for abdominal pain and accompanying clear penile discharge in 2012 does not have any value in explaining the presence of semen on the victim's panties and shirt in 2017. The state courts did not unreasonably apply clearly established federal law when it found this claim to be unmeritorious.

### 8.   The claim concerning Dog the Bounty Hunter (Claim 8).

<u>The details of this claim.</u>

In the petitioner's Claim 8, he notes that he was featured in "Dog's Most Wanted: Mardi Gras Manhunt," that "[t]he show aired shortly before my trial," that "[i]t portrayed me as a convicted rapist evading capture," and that it "possibly affect[ed] juror impartiality." He asserts that counsel "failed to inquire during voir dire if jurors had seen" the show and that counsel's questioning "allowed the prosecution to introduce the narrative involving Dog the Bounty Hunter." Rec. Doc. 3, pp. 28-29.

<u>Additional pertinent context facts.</u>

a.   The district attorney instituted prosecution against the petitioner in April 2017. SCR, Vol. 1, pg. 62. The case was initially scheduled to proceed to trial September 10, 2018, but the petitioner failed to appear. See SCR, Vol. 1, pg. 33 (minute entry; trial scheduled for September 10, 2018); *id*., pg. 35 (petitioner failed to appear for trial); *id*., pp. 36, 147-148 (warrant issued based upon defendant's failure to appear).

The petitioner's failure to appear caught the attention of Duane "Dog"

Chapman, who has attained celebrity status as the host of two reality television series—"Dog the Bounty Hunter" and "Dog's Most Wanted." Mr. Chapman attempted to apprehend the petitioner, and his attempts were documented on film as part of the "Dog's Most Wanted" series. SCR, Vol. 8, pg. 218. The petitioner was returned to custody on or about March 12, 2019. SCR, Vol. 1, pg. 37.

b.      The petitioner's counsel during *voir dire* asked the prospective jurors about, among other things, the television shows they watched. He asked about "cop shows." The prospective jurors variously answered that they watched "CSI", "NCIS", "NCIS Los Angeles," "Perry Mason," and "48 Hours." SCR, Vol. 2, pp. 75-77. Counsel did not specifically ask about the show "Dog's Most Wanted."

c.      The petitioner testified at trial. SCR, Vol. 4, pp. 98-138. During direct examination, trial counsel asked him about the fact that at one point in the proceedings he failed to appear. SCR, Vol. 4, pg. 127. During cross-examination, the prosecutor asked further questions about the petitioner's failure to appear. SCR, Vol. 4, pp. 136-137. This included the question, "Do you recall that Dog the Bounty Hunter came and found you?" *Id*., pg. 137, lines 18-19. The petitioner's response was: "He didn't come and find me." *Id*., pg. 137, line 20. This was the one and only mention of Dog the Bounty Hunter during the trial.

d.      The state district court analyzed this claim as follows:

> After his initial arrest, Defendant bonded out, Several months later he was arrested yet again, this time for third offense possession of marijuana. He testified that he was worried that the State would revoke his bond on the subject offender and therefore, failed to appear and an attachment was issued. He eventually was arrested several months later. In these two

*Strickland* claims,[*] Defendant seems to urge mutually exclusive arguments. First, that his attorney improperly "opened the door" for the State's argument about "Dog the Bounty Hunter" having tracked him down, and second, despite his argument that it was improper for [his attorney] to reference that factor, for failing to bring up "Dog" during the voir dire. Defendant can't have his cake and eat it too.

Defendant testified at trial. Taking the stand exposed Defendant to the full brunt of the State's questions relative to his past.

In order to diffuse [sic] the issue of Defendant's failure to appear, [trial counsel] brought it up in his direct examination. This tactic is often used so as to make the jurors aware of the issue in a less accusatory light than if it had been left for the State to mention during cross examination. [Trial counsel] never mentioned Dog the Bounty Hunter. That is, he did not "open the door" contrary to Defendant's assertions. "Dog" was first mentioned by name by the State, which was its right, during Defendant's cross-examination. Even if [trial counsel] had not questioned Defendant about having absconded, the State was free to ask the question. The real inculpatory evidence was not that a television personality had a role in finding the absent defendant, but rather, that Defendant evaded prosecution. These claims have no merit.

SCR, Vol. 7, pp. 81-82.

The adjudication of this claim by the state courts.

The last reasoned state court decision to address this claim reads as follows: "Applicant fails to show that he received ineffective assistance of counsel under the standard of *Strickland v. Washington*, 466 U.S. 668 (1984). With respect to his remaining claims, he fails to meet his post-conviction burden of proof. La.C.Cr.P. Arts. 930.2." *State v. Sexton*, 23-01178 (La. 1/17/24), 377 So.3d 234, 234.

The adjudication is not contrary to, or an unreasonable application of, clearly

---

\* The claim listed as "Claim 9" in the habeas petition was raised as two claims, "Claim 14" and "Claim 15," in the application for post-conviction relief. See SCR, Vol. 7, pp. 56-58.

established federal law.

The clearly established federal law governing this comes from *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires the petitioner to show "deficient performance" and "prejudice." A review of the state district court's reasoning when addressing this claim shows that the state courts did not unreasonably apply clearly established federal law when rejecting this claim.

<u>CONCLUSION AND PRAYER</u>

The petitioner fails to demonstrate that he is entitled to habeas corpus relief. The respondent respectfully prays that the Court dismiss the instant petition with prejudice and otherwise deny relief.

Respectfully Submitted,

<u>/s/ Matthew Caplan</u>
Matthew Caplan, #31650
Assistant District Attorney,
22nd Judicial District
701 Columbia Street
Covington, Louisiana 70433
Tel: (985) 809-8398

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing has been served upon petitioner

by mailing a copy, postage pre-paid, to:

> Jinel Sexton, # 419751
> Dixon Correctional Institute
> 5568 Highway 68
> Jackson, LA 70748

This the <u>2nd</u> day of <u>October</u>, 20<u>24</u>, at Covington, Louisiana.

<u>/s/ Matthew Caplan</u>
Matthew Caplan, #31650
Assistant District Attorney
