**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **JINEL SEXTON** | **CIVIL ACTION** |
| **VERSUS** | **NO. 24-1506** |
| **WARDEN EDWARD BICKHAM** | **SECTION "I"(1)** |

## REPORT AND RECOMMENDATION

Petitioner, Jinel Sexton, a Louisiana state prisoner, filed this federal habeas corpus application seeking relief pursuant to 28 U.S.C. § 2254. For the following reasons, it is recommended that the application be **DISMISSED WITH PREJUDICE**.

On October 25, 2019, petitioner was convicted under Louisiana law of sexual battery of a victim under the age of thirteen.[1]  On November 6, 2019, he pleaded guilty to being a second offender and was sentenced as such to a term of fifty years imprisonment.  It was ordered that his entire sentence be served without benefit of probation or suspension of sentence, and it was further ordered that twenty years of the sentence also be served without the benefit of parole.[2]  On April 16, 2021, the Louisiana First Circuit Court of Appeal affirmed his conviction, habitual offender adjudication, and sentence.[3]  The Louisiana Supreme Court then denied his related writ application.[4]

---

[1] Rec. Doc. 13-1, pp. 56 and 218-19; Rec. Doc. 13-4, p. 195.
[2] Rec. Doc. 13-1, pp. 58-59; Rec. Doc. 13-4, pp. 200-07.
[3] Rec. Doc. 13-6, pp. 24-36; State v. Sexton, No. 2020 KA 0682, 2021 WL 1440028 (La. App. 1st Cir. Apr. 16, 2021).
[4] Rec. Doc. 13-6, pp. 102-03; State v. Sexton, 324 So. 3d 82 (La. 2021).

On August 5, 2022, petitioner filed with the state district court an application for post-conviction relief.[5]  That application was denied on December 6, 2022.[6]  His related writ applications were denied by the Louisiana First Circuit Court of Appeal on April 24, 2023,[7] and July 28, 2023,[8] and by the Louisiana Supreme Court on January 17, 2024.[9]

Petitioner thereafter filed the instant federal application seeking habeas corpus relief.[10]  The state filed a response.[11]  In that response, the state concedes that petitioner's "petition is timely, and his claims are exhausted and not in procedural default," but argues that "his claims lack merit."[12]  Petitioner was afforded an opportunity to file a reply,[13] but no such reply was filed.

## I.  Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  Bell v. Cone, 535 U.S. 685, 693 (2002).  "AEDPA recognizes a foundational principle of our federal system:  State courts are adequate forums for the vindication of federal rights, and AEDPA therefore demands that state-court decisions be given the benefit of the doubt."  Mejia v. Davis, 906 F.3d 307, 314 (5th Cir. 2018) (citations and quotation marks omitted).

---

[5] Rec. Doc. 13-7, pp. 30-63.
[6] Rec. Doc. 13-7, pp. 69-86.
[7] Rec. Doc. 13-7, p. 174; State v. Sexton, No. 2023 KW 0122, 2023 WL 3058327 (La. App. 1st Cir. Apr. 24, 2023).
[8] Rec. Doc. 13-7, p. 175; State v. Sexton, No. 2023 KW 0500, 2023 WL 4842840 (La. App. 1st Cir. July 28, 2023).
[9] Rec. Doc. 13-9, pp. 110-11; State v. Sexton, 377 So. 3d 234 (La. 2024).
[10] Rec. Doc. 3.
[11] Rec. Doc. 14.
[12] Id. at p. 1.
[13] See Rec. Doc. 4, p. 2.

To that end, the AEDPA incorporated a "relitigation bar" in 28 U.S.C. § 2254(d), <u>see</u> <u>Langley v. Prince</u>, 926 F.3d 145, 155 (5th Cir. 2019), which requires federal courts to accord a high degree of deference to state court decisions denying a prisoner's claims on the merits. Regarding § 2254(d), the United States Fifth Circuit Court of Appeals has explained:

> In enacting that provision, Congress imposed strict limitations on federal courts considering habeas applications from state prisoners. <u>See, e.g.</u>, <u>Harrington v.</u> <u>Richter</u>, 562 U.S. 86, 102, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011); <u>Langley v.</u> <u>Prince</u>, 926 F.3d 145, 155 (5th Cir. 2019) (en banc), <u>cert. denied</u>, ___ U.S. ____, 140 S. Ct. 2676, 206 L.Ed.2d 826 (2020) (mem.); <u>see also</u> <u>Shinn v. Kayer</u>, ___ U.S. ___, 141 S. Ct. 517, 526, ___ L.Ed.2d ___ (2020) (per curiam) ("Under AEDPA, state courts play the leading role in assessing challenges to state sentences based on federal law."). "To overcome AEDPA's relitigation bar, a state prisoner must shoehorn his claim into one of its narrow exceptions." <u>Langley</u>, 926 F.3d at 155; <u>see</u> 28 U.S.C. § 2254(d)(1)-(2).

<u>Lucio v. Lumpkin</u>, 987 F.3d 451, 467 (5th Cir. 2021) (textual alteration removed).

The Fifth Circuit has observed that there are three such exceptions:

> The statute provides three exceptions to the general relitigation bar. A petitioner may obtain federal habeas relief on a claim that has been litigated in state court if the petitioner can show that the state court's decision was **contrary to** a federal law that was clearly established in Supreme Court holdings, that the decision was an **unreasonable application** of such law, or that the decision was based on an **unreasonable factual determination**.

<u>Williams v. Thaler</u>, 684 F.3d 597, 602 (5th Cir. 2012) (emphasis added).

The "contrary to" exception is found in 28 U.S.C. § 2254(d)(1). Regarding the exception, the Fifth Circuit has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

<u>Wooten v. Thaler</u>, 598 F.3d 215, 218 (5th Cir. 2010) (footnotes, quotation marks, ellipses, and brackets omitted).  The "contrary to" exception is narrow and "does not apply" "in most AEDPA cases."  <u>Langley</u>, 926 F.3d at 155-56.

The "unreasonable application" exception, which is likewise found in 28 U.S.C. § 2254(d)(1), is more often litigated but "almost equally unforgiving."  <u>Id.</u> at 156.  Concerning that exception, the United States Supreme Court has explained:  "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case."  <u>White v. Woodall</u>, 572 U.S. 415, 426 (2014).  But the Supreme Court expressly cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error.  Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision.  AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

<u>Id.</u> (citations and quotation marks omitted).

Further, for that "unreasonable application" exception to apply, "a prisoner must show far more than that the state court's decision was 'merely wrong' or 'even clear error.'"  <u>Shinn v. Kayer</u>, 592 U.S. 111, 118 (2020) (quoting <u>Virginia v. LeBlanc</u>, 582 U.S. 91, 94 (2017)); <u>see also</u> <u>Bell</u>, 535 U.S. at 694 ("[A]n unreasonable application is different from an incorrect one.").  Indeed:

> "[T]he [AEDPA's] relitigation bar forecloses relief unless the prisoner can show the state court was *so* wrong that the error was well understood and comprehended in existing law beyond any possibility for fairminded disagreement.  In other words, **the unreasonable-application exception asks whether it is beyond the realm of possibility that a fairminded jurist could agree with the state court.**

<u>Langley</u>, 926 F.3d at 156 (boldface emphasis added; citations and quotation marks omitted). "Under AEDPA's relitigation bar, the very existence of reasonable disagreement forecloses relief." <u>Id.</u> at 170.

The third exception, which is found in 28 U.S.C. § 2254(d)(2), concerns a state court's factual determinations. Under that exception, a federal court shall not grant relief with respect to any claim adjudicated on the merits in state court proceedings "unless the adjudication of the claim … resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). <u>See also</u> 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

Regarding these standards of review, the Fifth Circuit has emphatically reiterated:

> "When Congress supplies a constitutionally valid rule of decision, federal courts *must* follow it." <u>Brown v. Davenport</u>, ___ U.S. ___, 142 S. Ct. 1510, 1520, 212 L.Ed.2d 463 (2022) (emphasis added). "In AEDPA, Congress announced such a rule." <u>Id.</u> Congress "designed [AEDPA] to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions." <u>Richter</u>, 562 U.S. at 103, 131 S.Ct. 770. AEDPA's deference to state court decisions means *deference*, not *de novo*. Federal habeas review is "not a substitute for ordinary error correction through appeal." <u>Id.</u> at 102-03, 131 S.Ct. 770. "[I]f AEDPA makes winning habeas relief more difficult, it is because Congress adopted the law to do just that." <u>Davenport</u>, 142 S. Ct. at 1526.

<u>Russell v. Denmark</u>, 68 F.4th 252, 273 (5th Cir. 2023), <u>cert. denied</u>, 144 S. Ct. 576 (2024).

In summary, "AEDPA prevents defendants – **and federal courts** – from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." <u>Renico v. Lett</u>, 559 U.S. 766, 779 (2010) (emphasis added). And the Supreme Court has expressly

warned that although "some federal judges find [28 U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the law and apply the strictly deferential standards of review mandated therein.  Woodall, 572 U.S. at 417.

## II.  Facts

On direct appeal, the Louisiana First Circuit Court of Appeal summarized the facts of this case as follows:

> On January 15, 2017, at 6:55 a.m., J.B. (the victim), who was twelve years old at the time, called 911 and reported being "raped" the night before.[FN 1]  The incident occurred at the Abita Springs residence of the defendant, the biological father of the victim's older sister.  The victim told the dispatcher that the defendant had left to go to work prior to the time of the call and that she was in the home alone, as the defendant's sons who lived there were at their grandmother's house at the time.  She stated that she had already contacted her parents, who lived in Ponchatoula, and that they were on their way to the defendant's residence, but that she wanted someone closer to come to the residence.  The victim also stated that the defendant had given her some "medicine" that was supposed to treat acne, adding that he had given her "two of them and a green tiny one."[FN 2]  She further stated that she did not remember falling asleep, but noted that when she woke up, "[the defendant] was like touching all over me and stuff."  The victim made consistent claims to Detective Carlee Messina of the St. Tammany Parish Sheriff's Office, who reported to the St. Tammany Parish Hospital, where the victim was transported by the 911 responders.

> [FN 1]  Because J.B. was a minor, we use initials to refer to her.  See La. R.S. 46:1844(W).

> [FN 2]  Regarding the "medicine" the defendant claimed would treat acne, the victim noted that the defendant gave her "two" but would normally give her "three of them."

> Later that morning, the defendant was transported by deputies to Detective Messina's office.  Detective Messina informed the defendant of his Miranda[FN 3] rights and a waiver of rights form was executed.  After the interview, Detective Messina obtained a warrant for the defendant's arrest, a search warrant for his residence, and later obtained a search warrant for the defendant's DNA.  In executing the search warrant for the defendant's residence, Detective Messina recovered and/or photographed several items including a green t-shirt with gray print on it,[FN 4] bedding, a Flintstones vitamin bottle, and prescription bottles.  In addition to the pretrial interview, the defendant testified at trial.  The defendant

denied having given the victim any medications but stated that when he was taking vitamins, the victim asked for one, and he gave her one.  According to the defendant, when he was awakened by his alarm clock the next morning, the victim was on top of him, and it "freaked [him] out."  He explained that his first reaction was to get her off of him and then he had a conversation with her.  The defendant said that he told the victim, "this is not right" and that "[she] shouldn't be doing this."  He testified that an incident of that nature had never occurred before that morning.

> [FN 3]  <u>Miranda v. Arizona</u>, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966).

> [FN 4]  At trial, Kathy Hebert, the defendant's girlfriend, testified that the green t-shirt in evidence belonged to her.

Detective Messina scheduled a recorded interview of the victim for January 24, 2017, at the Children's Advocacy Center, in which the victim again made consistent claims against the defendant.  The victim stated that she was taken to the hospital because "[her sister's] dad was being nasty."  She specifically added that close to nighttime, the defendant (Smiley) gave her a green vitamin and two little white "powdery pills" that he told her would get rid of acne, and she fell asleep.  When she woke up, she was in the defendant's room, in his bed, wearing a shirt and no underwear, and the defendant was "touching all over [her] and stuff."  When asked to specify where the defendant was touching her, the victim pointed to the vaginal area of a diagram, stated that she called it "a private part," and described how the defendant used his "boy part" to touch her private part.  She confirmed that the term "boy part" was a reference to the defendant's penis.  According to the victim, "it was just rubbing down there," on top of her private part, and she specifically denied that it had been inside of her private part.  When asked how it felt, she stated that it felt weird.  When asked about the rest of the defendant's body, she explained it was close to her, that she was on her side and the defendant was behind her.  The victim further stated that she felt uncomfortable and dizzy.

After the defendant got dressed for work and left, the victim went to her sister's room and texted a friend from school who told her to call 911.  The victim said that she first called her aunt, and then called 911 and told them she was raped.  When asked what "raped" meant, the victim stated that rape was "what Mr. Smiley did" to her.  She stated that she was shocked and that she did not understand why the defendant would do this to her.

The victim was subsequently interviewed on February 14, 2017, by Dr. Jamie Jackson of the Audrey Hepburn Care Center of the Children's Hospital.  At that time the victim again made consistent detailed claims against the defendant, specifically stating that the defendant had given her pills the night before the incident, when she woke up, she was only wearing a shirt,[FN 5] the defendant's "boy parts" were "nibbing up against" her "girl parts," and that it lasted for "maybe about three minutes" before the defendant got up to go to work.  However, at trial,

the victim, who was then fifteen years old, identified the defendant in court as her sister's dad, but would not respond to other questions, such as whether she had been at the defendant's house or whether she remembered the last time she saw the defendant. When asked if there was anything she wanted to say, she stated, "Uhm ... the truth is that it wasn't him in that – it was all my fault. And the only reason I ever called the police in the first place is because – that I was scared I would get in trouble, and I didn't know that all of this would have happened, and I'm sorry, I guess." When asked why she thought it was her fault, she stated, "It's my fault because I said it was, and that's the truth, and that's all I'm going to say, so stop asking me questions." When asked if anyone told her what to say at trial, she stated, "No, and that's the truth. Okay, that's the truth. Is everyone listening, because I said it's the truth." The State tendered the victim for cross-examination, but the defense attorney declined to question the victim, and she was released from her subpoena.

> [FN 5]  The victim indicated that before falling asleep, she had put on pants (or pajamas).

Natasha Poe of the St. Tammany Parish Coroner's Office, accepted as an expert witness in DNA analysis, also testified at trial. Poe tested the contents of the victim's sexual assault kit, the green t-shirt, and a reference sample from the defendant. Chemical presumptive tests for the presence of semen performed on swabs of the victim's genitalia, perineum, inner thigh, the crotch of the victim's panties, and portions of the green t-shirt were all positive. During confirmation testing, spermatozoa were identified on the crotch of the victim's panties and on the back of the green t-shirt, confirming the presence of semen. The sperm fraction of one half of each anal swab produced a profile consistent with the defendant's DNA profile and a haplotype consistent with the defendant's haplotype.[FN 6] The sperm fraction of one-half of each perineum swab produced a DNA profile consistent with the defendant's DNA profile and a haplotype consistent with the haplotype obtained from the swab of the defendant. A DNA profile foreign to the victim obtained from swabs from the victim's neck, ear, fingernails, as well as from the hip areas and crotch of the victim's panties, was consistent with the defendant's DNA profile. The swabs from the victim's fingernails, the epithelial and sperm fractions from the crotch of the victim's panties, and the hip areas of the victim's panties produced haplotypes consistent with the haplotype obtained from the swab of the defendant.

> [FN 6]  A haplotype is the genetic constitution of an individual with respect to one member of a pair of allelic genes; or, in immunogenetics, that portion of the phenotype determined by a set of closely linked genes inherited from one parent (i.e., genes located on one of the pair of chromosomes). Stedman's Medical Dictionary, (2014). Poe testified, "a father will hand down the exact same Y haplotype to his son, which will then pass it down to his son. So you can't make a difference from a father and son's Y haplotype, because they're exactly the same." Regarding some of the samples for which she was able to make

conclusions, Poe noted that the male DNA was consistent with the defendant or someone in his paternal lineage.[14]

### III.  Petitioner's Claims

### A.  Admission into Evidence of Jail Telephone Calls

As his first claim, petitioner asserts:  "Court erred when it allowed the admissibility of jail calls that were irrelevant and more prejudiced to defendant."[15]  On direct appeal, the Louisiana First Circuit Court of Appeal denied that claim, holding:

> In the sole assignment of error, the defendant asserts that jail calls admitted by the trial court were not relevant to his guilt or innocence.  He further contends that the calls were used to make him look like a bad person with a temper, discredit the defense attorney, and reveal to the jury that he was incarcerated at the time of the trial.  The defendant points out that in one of the calls, he is heard belittling the defense attorney after a disagreement.  The defendant maintains that the State was allowed to use his conversations to accuse him of obstruction of justice for allegedly tampering with a witness (the alleged victim) although there was nothing dispositive in the calls to demonstrate obstruction or tampering.  He notes that the State alleged that he and the other party to the calls spoke in "code" when they said things like "everything is everything" and "blocking."  The defendant claims that the State offered no evidence that he had any contact with the victim or that he directed anyone else to contact the victim.  He suggests that his girlfriend, Kathy Hebert, the other party on the jail calls, and the victim both testified that they had no contact with one another during the pendency of the case.[FN 7]  Thus, the defendant urges that the jail calls were not probative but were highly prejudicial and likely contributed to the guilty verdict.

>> [FN 7]  Although the victim denied that anyone told her what to say at trial, and Hebert denied any attempt to get the victim to change her story, notably, neither witness was directly asked if she had any conversations or contact with the other prior to trial.

> Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.  La. C.E. art. 401.  All relevant evidence is admissible except as otherwise provided by positive law. Evidence which is not relevant is not admissible.  La. C.E. art. 402.  Although

---

[14] Rec. Doc. 13-6, pp. 25-29; <u>State v. Sexton</u>, No. 2020 KA 0682, 2021 WL 1440028, at *1-2 (La. App. 1st Cir. Apr. 16, 2021).
[15] Rec. Doc. 3, p. 5.

relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.  La. C.E. art. 403.  A trial court's determination regarding the relevancy and admissibility of evidence will not be overturned on appeal absent a clear abuse of discretion.  State v. Freeman, 2007-0470 (La. App. 1st Cir. 9/14/07), 970 So.2d 621, 625, writ denied, 2007-2129 (La. 3/14/08), 977 So.2d 930.

Under La. C.E. art. 404(B)(1), other crimes evidence "is not admissible to prove the character of a person in order to show that he acted in conformity therewith."  The evidence may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or accident.  La. C.E. art. 404(B)(1).  Evidence of other crimes to prove knowledge, system, or intent is generally inadmissible when its relevance is outweighed by its prejudicial effect.  See La. C.E. art. 403; State v. Graves, 301 So.2d 864, 866 (La. 1974).

Nevertheless, evidence of a defendant's attempt to threaten, kill, intimidate, or dissuade a witness from testifying is a well-recognized exception to the general rule that evidence of other crimes is not admissible.  See State v. Burnette, 353 So.2d 989, 991 (La. 1977); State v. Williams, 2014-1194 (La. App. 1st Cir. 3/6/15), 2015 WL 996231, at *7.  Additionally, evidence of an attempt to influence witnesses or fabricate evidence is admissible despite its prejudicial effect.  See State v. Graves, 301 So.2d at 866.

The Louisiana Supreme Court has addressed the issue of the admissibility of evidence where a defendant attempted to influence the testimony of witnesses, indicating that such evidence has substantial probative value in a proceeding designed to test the guilt or innocence of an accused.  Burnette, 353 So.2d at 992.  For this reason, the question of whether the evidence should be admitted has been almost universally answered in the affirmative.  Williams, 2015 WL 996231 at *7.

Actions by a defendant that are designed to prevent witnesses from testifying give rise to an inference that he acted from a consciousness of his own guilt.  Burnette, 353 So.2d at 992.  Thus, such evidence is admissible and relevant to show consciousness of guilt on the defendant's part and his desire to evade prosecution.  State v. Lewis, 2012-0803 (La. App. 4th Cir. 9/25/13), 125 So.3d 1252, 1263, writ denied, 2013-2537 (La. 6/20/14), 141 So.3d 279.

In determining the admissibility of evidence of other criminal acts of the accused, constituting admissions by conduct intended to obstruct justice or avoid punishment for the present crime, the trial court must decide, outside the jury's presence and in advance of the introduction of the evidence, whether (1) the evidence fits the class of evidence constituting such admissions by conduct; (2) there is substantial evidence that the defendant committed the other crimes; and (3) the probative value of such other crimes evidence will outweigh its prejudicial effect.  If the other crimes evidence fails to pass any of these three tests, it must be excluded.  Burnette, 353 So.2d at 992.

In the instant case, the trial court held a hearing outside the presence of the jury to determine the admissibility of several jail calls that the State sought to introduce, occurring the month of the trial, which began on October 22, 2017. The series of calls specifically took place prior to the trial, between October 7, 2019 and October 20, 2019, and one or more additional calls took place on the night of the first day of the trial. The defense attorney objected to the admission of the jail calls contending that the jury would be made aware that the defendant was incarcerated at that time, the defendant would be subject to questions about the jail calls and/or obstruction of justice if he were to testify, and the calls were highly prejudicial. The State maintained that the jail calls showed an effort to coordinate either the lack of an appearance of the victim or to encourage the victim to tell a lie at the trial. The State asserted that the relevance of the jail calls became apparent when the district attorney's office attempted to meet with the victim before the trial. The victim's mother brought the victim to the office an hour and a half late, and there was a lack of cooperation at the time.

The trial court allowed the State to introduce those jail calls that had occurred prior to the start of the trial but ruled that those calls recorded on the night of the first day of trial, which had not yet been heard by the defense attorney, were inadmissible based upon the timing of the disclosure. A subsequent motion for mistrial based on the admission of the jail calls asserted by defense counsel was denied by the trial court.

The jail calls were played during the trial testimony of Christopher Johnson, an investigator for the district attorney's office. Johnson testified that after failed attempts at locating the victim's mother, he was first able to contact her on October 1, 2019, when he received a call back from her. He stated that the victim's mother was cooperative during their conversation and that a meeting was scheduled for October 7th. He noted, however, that when the victim and her mother arrived, the victim was "completely shut down." According to Johnson, the victim was looking at the floor the whole time, would not look at him, and would not answer salutations or greetings. Johnson recalled that the victim acted as if she did not want to be there and pointed out that the victim's mother seemed to play the role of the "authoritarian," answering questions that were directed at the victim.

Johnson confirmed that after the October 7th meeting, there was a period of a few days in which the district attorney's office again could not establish contact with the victim's mother to follow up. They ultimately went to the victim's grandmother's residence in Ponchatoula. Although the victim's mother initially came to the door, she quickly went back inside prior to returning outside to accept service of a subpoena. The victim's mother did not keep an arrangement for future contact and was non-responsive to subsequent messages.

On October 18th, the victim's mother contacted Johnson and agreed to bring the victim to the district attorney's office that day to prepare for trial. Arriving after the scheduled time, the victim's mother initially agreed to allow the assistant district attorney to prepare the victim for trial alone. The victim's mother subsequently sent text messages to Johnson expressing concerns about not being present during

11

the victim's trial preparation.  Johnson conferred with the assistant district attorney, who indicated that it would be fine for the victim's mother to be present.  Before Johnson could communicate the information to her, the victim's mother became visibly upset and, as the assistant district attorney came out of the office with the victim, the victim's mother grabbed the victim's arm and left with the victim.  They never returned to the district attorney's office.

Some of the jail calls took place before the victim and her mother arrived at the district attorney's office on October 7th.  A female, identified as Hebert, began the first call by saying, "Si señor."  The defendant can be then heard questioning her as to whether or not she had spoken to "dumb ass."[FN 8]  Hebert responded, "Yeah.  He said ... he plans to call her after the meeting and then he's scheduling a meeting with them ... and then he said ... he's gonna find out what it was all about and what if or if anything they're trying to get her to testify for...."  The defendant subsequently told Hebert to call his mother and tell her to call "dumb ass and see what the deal was."  Hebert responded, "So she told her she'll be calling her as soon as she leaves ... and she said, um, the way she talkin' she don't care what they do."  The defendant replied, "Yeah well, she tried that s*** and they forced her hand the last time."  During subsequent jail calls, the defendant is heard asking Hebert if his mother had called "her" yet and repeatedly telling Hebert to call his mother and to tell his mother that he said to call "her."

> [FN 8]  While it is unclear from the jail calls, Johnson testified that he assumed the defendant was speaking of the defense attorney in using the phrase "dumb ass."  We further note that at trial Hebert confirmed that she was the other party on the jail calls that took place days before the trial, the defendant asked her to "make sure that everything is everything," and she and the defendant talked about the defendant's mother during the calls.  Likewise, the defendant admitted at trial that he communicated with his mother through Hebert during the jail calls.  However, neither provided any additional context for the jail calls.

At the outset of the fourth call, which presumably took place after the October 7th meeting, Hebert informed the defendant, "She say that um ... [inaudible] went with her but didn't say a word ... didn't say nothin' the whole time ... and uh they told her that they wantin' to put her on the you know and she said no, she's not doin' it, and uh, she said ... she ain't havin' it and she don't care... Yo momma said ... she told her they go try to f*** with her and s*** and she said she don't give a f***."  The defendant replied, "Okay" and asked Hebert if she relayed the information to "dumb ass" yet.  At the end of the call, the defendant told Hebert to talk to his mother again and "tell her to find out you know if they you know tried to coerce her in any way."  He added, "see what they talkin' about ... if they was talkin' about f****** with her then and find out how long were they up there for."

During subsequent jail calls, the defendant can be heard repeatedly telling Hebert to call his mother, complaining about the way things were being relayed, and asking whether or not "she" was being coerced, forced, or threatened.  Specifically, at one point during a jail call, the defendant stated, "Right now that

[expletive] just told y'all what she did, you need to be findin' out what the f*** she did and if she really did it, we ain't got nothin' to worry about." He later added, "Call that b**** ... see what's goin' on ... send that [expletive] to Kalamazoo if, if that's what it take." The defendant further stated, "Call my momma ... s*** ain't gettin' relayed the way it should, my momma ain't got f****** understanding as far as what need to be [expletive] said or not or asked ... s*** drivin' me crazy ... do the s***, make it happen, get the information." In a later call, at the outset Hebert abruptly stated, "Not going, not going, don't care what happens, not going." The defendant replied, "Oh, yeah?" Hebert told the defendant that his mother had just relayed that message to her. The defendant later asked if anyone had threatened "her" and Hebert replied in part, "No, told her [sic] they needed to" adding, "and we pretty sure it was ol' boy."

       Considering the three-pronged analysis set forth by <u>Burnette</u>, we find that the jail calls were properly admitted. The content and timing of the jail calls seemingly indicate that the defendant was attempting to influence or have others influence initially what would happen during the victim's scheduled meeting with the assistant district attorney and subsequently as to whether or not the victim would continue to evade questioning and/or not appear at trial. The probative value of this evidence is substantial in that it was presented to explain the victim's recantation at trial of her consistent pretrial claims. Any prejudicial effect that might have existed was substantially outweighed by this probative value. Mindful that the defendant has not provided any other plausible explanation or context for the content of the jail calls to the contrary, we conclude that the trial court did not err or abuse its discretion in admitting the jail calls to show consciousness of guilt on the defendant's part and his desire to evade prosecution. We find no merit in the sole assignment of error.[16]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning reasons.[17]

       The United States Fifth Circuit Court of Appeals has held: "In habeas actions, [a federal court] does not sit to review the mere admissibility of evidence under state law." <u>Little v. Johnson</u>, 162 F.3d 855, 862 (5th Cir. 1998). Therefore, to the extent that petitioner is arguing that the state courts misapplied state evidence law by admitting the calls into evidence, his claim simply is not

---

[16] Rec. Doc. 13-6, pp. 29-36; <u>State v. Sexton</u>, No. 2020 KA 0682, 2021 WL 1440028, at *3-6 (La. App. 1st Cir. Apr. 16, 2021).
[17] Rec. Doc. 13-6, pp. 102-03; <u>State v. Sexton</u>, 324 So. 3d 82 (La. 2021).

reviewable in this federal proceeding. See, e.g., Pettus v. Cain, Civ. Action No. 14-1685, 2015 WL 1897711, at *7 (E.D. La. Apr. 27, 2015).

To the extent that petitioner is asserting a federal claim, he fares no better. Even if petitioner could show that the evidence was in fact improperly admitted, which is questionable for the reasons explained by the Louisiana First Circuit Court of Appeal, federal habeas relief still would not be warranted. The United States Fifth Circuit Court of Appeals has explained:

> We will not grant habeas relief for errors in a trial court's evidentiary rulings unless those errors result in a "denial of fundamental fairness" under the Due Process Clause. The erroneous admission of prejudicial evidence will justify habeas relief only if the admission was a crucial, highly significant factor in the defendant's conviction.

Neal v. Cain, 141 F.3d 207, 214 (5th Cir. 1998) (citations omitted); accord Little, 162 F.3d at 862 ("[O]nly when the wrongfully admitted evidence has played a crucial, critical, and highly significant role in the trial will habeas relief be warranted.").

Here, it simply cannot be said that the admission of the calls played a crucial, critical, and highly significant role in petitioner's instant conviction. As an initial matter, it must be noted that the jurors were carefully instructed by the judge regarding the limited purposes for which "other crimes" evidence could be considered,[18] and courts have repeatedly noted that jurors are presumed to follow their instructions. See, e.g., Jones v. United States, 527 U.S. 373, 394 (1999); United

---

[18] The judge instructed the jury:

> Evidence that the defendant was involved in the commission of an offense other than the offense for which he is on trial is to be considered only for a limited purpose.
> The sole purpose for which such evidence may be considered is whether it tends to show such things as motive, opportunity, intent, preparation, plan, knowledge, or identity, but not to prove the bad character of the defendant.
> Remember the defendant is on trial only for the offense charged. You may not determine the defendant's guilt relative to this offense merely because he may have committed another offense.

Rec. Doc. 13-4, pp. 186-87.

States v. Ornelas-Rodriguez, 12 F.3d 1339, 1349 (5th Cir. 1994).  Further, the comments made in telephone calls, although probative in that they shed light on the victim's recantation at trial, were vague at best and not direct evidence of petitioner's guilt of the charged offense.  On the other hand, there was ample compelling evidence of plaintiff's guilt of the crime charged presented at trial, including the victim's repeated, consistent pretrial statements concerning the sexual battery and the DNA evidence.  In light of that compelling evidence, the admission of the vague telephone calls was not a crucial, highly significant factor in petitioner's conviction.

In summary, to be entitled to relief, petitioner must demonstrate that the state court decision rejecting this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  He has not made that showing in the instant case.  Accordingly, this Court should likewise deny relief.

## B.  Brady Violation

As his second claim, petitioner asserts:  "Prosecutorial misconduct for failing to provide Brady material relative to victim's drug screen."[19]  In the state post-conviction proceedings, the state district court found that this claim was both procedurally barred and lacked merit.  As to the merits of the claim, the court held:

> Defendant asserts a Brady violation claiming that the State withheld evidence of a portion of the victim's Children's Hospital urine drug screen.  He quotes an exchange between counsel occurring before jury selection relative to a "confirmation test."  Counsel for the State maintained that the evidence was contained in the Children's records and offered to point it out to Mecca.  Mecca admitted that he had received the Children's records but hadn't seen the confirmation [FN 4]  That is, the State had not withheld the confirmation test.  Mecca had merely overlooked it.  Dr. Jaimie Jackson, who examined the victim during her interview at the AHCC pointed out the confirmation test to Mecca and the jury.

---

[19] Rec. Doc. 3, p. 7.

[FN 4]  Defendant asserts a <u>Strickland</u> claim relative to the "confirmation" test in his Claims 3 and 4.

Defendant goes on to argue that the State was "not forthcoming" about the drug screens.  His argument here is difficult to understand.  He seems to offer his own scientific analysis to establish that the results showed the presence of other drugs that were not found in his home.  He does not provide any expert reports to support his arguments or contradict the evidence and testimony at trial.  The confirmation test of the Children's urine sample showed positive for temazepam,[FN 5] one of the many drugs in the benzodiazepam family, which was found at his home.  Even if that drug had not been found at his home, the victim told all the professionals that Defendant gave her pills that made her groggy and she tested positive for benzodiazepams which would have had that effect.

[FN 5]   The prescription bottle containing the temazepam seized at the Defendant's home indicated that that medication had been prescribed for his sister who testified that she sometimes babysat for Defendant's children when he was out of town working.  The sister was not a permanent resident of Defendant's home.

Defendant admits that the concentration levels of temazepam were above the cutoff levels, but seems to argue that the victim could have obtained <u>other</u> drugs, specifically, Valium and Xanax[FN 6] from her Mother or Grandmother, who he claims had prescriptions.  He contends that it was the State's obligation to provide evidence of those prescriptions.  In this pleading he has failed to offer any proof of those alleged prescriptions.  He also does not allege that either the Mother or Grandmother had prescriptions for temazepam and offers no explanation of an alternative source for that drug in the victim's urine.

[FN 6]  The generic form of Valium is diazepam.  The generic form of Xanax is alprazolam.  Neither are temazepam.

In this <u>Brady</u> claim (not a <u>Strickland</u> claim) he alleges that Mecca was "not allowed the opportunity to examine, research or investigate evidence … (or) cross examine the lab technician who performed the test, consult with an expert about the half-life of the drugs in the blood."  There were no blood draws ordered or performed and there is no evidence that the State prevented any such examination.[20]

---

[20] Rec. Doc. 13-7, pp. 74-76.

The Louisiana First Circuit Court of Appeal then denied petitioner's related writ application without assigned reasons.[21]  The Louisiana Supreme Court thereafter likewise denied relief, simply stating that petitioner "fail[ed] to meet his post-conviction burden of proof. La.C.Cr.P. arts. 930.2."[22]

As the state acknowledges in its answer, the state district court's finding that this claim was procedurally barred is of no moment, in light of the Louisiana Supreme Court's subsequent denial of the claim on the merits.[23]  That later action precludes a finding that the claim is procedurally barred on federal habeas review.  See Rhoades v. Davis, 914 F.3d 357, 372 (5th Cir. 2019) ("State procedural bars are not immortal, however; they may expire because of later actions by state courts. The Supreme Court has made clear that if the last state court presented with a particular federal claim reaches the merits, that decision removes the procedural bar to federal court review." (footnote and quotation marks omitted)).  Nevertheless, although the claim is not procedurally barred, federal relief still is not warranted because, for the following reasons, the claim fails on the merits.

With respect to Brady claims, the United States Supreme Court has held:

A Brady violation occurs when the government fails to disclose evidence materially favorable to the accused.  This Court has held that the Brady duty extends to impeachment evidence as well as exculpatory evidence, and Brady suppression occurs when the government fails to turn over even evidence that is known only to police investigators and not to the prosecutor.

---

[21] Rec. Doc. 13-7, p. 175; State v. Sexton, No. 2023 KW 0500, 2023 WL 4842840 (La. App. 1st Cir. July 28, 2023). An earlier related writ application had been denied because petitioner failed to provide the required supporting documentation; however, he was given the opportunity to refile a proper and complete application.  Rec. Doc. 13-7, p. 174; State v. Sexton, No. 2023 KW 0122, 2023 WL 3058327 (La. App. 1st Cir. Apr. 24, 2023).
[22] Rec. Doc. 13-9, pp. 110-11; State v. Sexton, 377 So. 3d 234 (La. 2024).
[23] Rec. Doc. 14, p. 8 & n.14.

Youngblood v. West Virginia, 547 U.S. 867, 869-70 (2006) (internal citations and quotation marks omitted).    Therefore, to prevail on a Brady claim, a petitioner "**must show** that **(1) the state withheld evidence,** (2) the evidence was favorable to the accused, and (3) the evidence is material to guilt or punishment." DiLosa v. Cain, 279 F.3d 259, 262-63 (5th Cir. 2002) (emphasis added). Here, petitioner's claim fails at the very first step of that required analysis.

As noted by the state district court, there is no support for the allegation that the evidence in question here was withheld.  On the contrary, when defense counsel asked whether there were confirmations of the drug screens, the prosecutor stated that "[t]here are confirmations in the medical records" that had been provided to defense counsel and offered to "point them out" to him.[24]  Where, as here, a petitioner presents no evidence whatsoever that the purported Brady material was in fact withheld from the defense, his claim fails at the initial prong of the Brady inquiry.  Williams v. Cain, Nos. 06-0224 and 06-0344, 2009 WL 1269282, at *5 (E.D. La. May 7, 2009), aff'd, 359 F. App'x 462 (5th Cir. 2009); Watson v. Cain, Civ. Action No. 06-613, 2007 WL 1455978, at *7 (E.D. La. May 17, 2007); Harris v. United States, 9 F. Supp. 2d 246, 275 (S.D.N.Y. 1998) ("[T]he government does not bear the burden of establishing that documents were not withheld; it is [petitioner's] burden to prove that the government failed to disclose evidence favorable to [him]."), aff'd, 216 F.3d 1072 (2nd Cir. 2000).

For all of the foregoing reasons, petitioner simply has not demonstrated that the state court decision rejecting his Brady claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

---

[24] Rec. Dc. 13-1, pp. 251-52.

Accordingly, applying the AEDPA's deferential standard of review, this Court should likewise reject that claim.

### C.  Prosecutorial Misconduct as to the Introduction of the Shirt into Evidence

As his third claim, petitioner asserts:  "Prosecutorial misconduct for introduction of 'false evidence' in the form the t-shirt seized at crime scene."[25]  In the state post-conviction proceedings, the state district court found that this claim was both procedurally barred and lacked merit.  As to the merits of the claim, the court held:

> Defendant asserts prosecutorial misconduct in the introduction of 'false evidence' relative to a shirt collected at the crime scene.  Admittedly, there is some inconsistency in the trial testimony about the color of the shirt.  What is not inconsistent is that the victim told Detective Messina that after she left Defendant's bedroom, she went back to Brooklynn's room and changed clothes.  After a search warrant was authorized, Detective Messina found a shirt on the floor of that room and collected it as evidence.  **The shirt tested positive for Defendant's semen.**
> Defendant states that his girlfriend had left some of her things at his house.  The girlfriend testified that the shirt was hers.  That is possible, but not inconsistent with the State's case.  The victim might have put the shirt on sometime during her visit.  The girlfriend was not living with the Defendant at the time, having given him a sexually transmitted disease for which he had been prescribed an antibiotic on November 2, 2016.  It is not inconceivable that the girlfriend would have discarded a shirt with Defendant's semen on <u>Brooklynn's bedroom floor amongst her and her baby's things</u> and that that shirt would still be there months after Defendant learned of his girlfriend's infidelity. [26]

The Louisiana First Circuit Court of Appeal then denied petitioner's related writ application without assigned reasons.[27]  The Louisiana Supreme Court thereafter likewise denied relief, simply

---

[25] Rec. Doc. 3, p. 8.

[26] Rec. Doc. 13-7, p. 76.

[27] Rec. Doc. 13-7, p. 175; <u>State v. Sexton</u>, No. 2023 KW 0500, 2023 WL 4842840 (La. App. 1st Cir. July 28, 2023). An earlier related writ application had been denied because petitioner failed to provide the required supporting documentation; however, he was given the opportunity to refile a proper and complete application.  Rec. Doc. 13-7, p. 174; <u>State v. Sexton</u>, No. 2023 KW 0122, 2023 WL 3058327 (La. App. 1st Cir. Apr. 24, 2023).

stating that petitioner "fail[ed] to meet his post-conviction burden of proof. La.C.Cr.P. arts. 930.2."[28]

Again, because the Louisiana Supreme Court denied this claim on the merits, the claim is not procedurally barred on federal habeas review.  See Rhoades v. Davis, 914 F.3d 357, 372 (5th Cir. 2019).  However, it fails on the merits for the following reasons.

"[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment."  Napue v. Illinois, 360 U.S. 264, 269 (1959); see also Giglio v. United States, 405 U.S. 150, 153 (1972) ("As long ago as Mooney v. Holohan, 294 U.S. 103, 112, 55 S.Ct. 340, 342, 79 L.Ed. 791 (1935), this Court made clear that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'"); Moody v. Johnson, 139 F.3d 477, 484 (5th Cir. 1998) ("It is well settled that the State is not permitted to present false evidence or allow the presentation of false evidence to go uncorrected.").  However, "[t]o establish a due process violation based on the State's knowing use of false or misleading evidence, [a petitioner] must show (1) the evidence was false, (2) the evidence was material, and (3) the prosecution knew that the evidence was false.  Evidence is 'false' if, *inter alia*, it is specific misleading evidence important to the prosecution's case in chief."  Nobles v. Johnson, 127 F.3d 409, 415 (5th Cir. 1997) (citations and quotation marks omitted); see also Westley v. Johnson, 83 F.3d 714, 726 (5th Cir. 1996).

Here, petitioner has presented no evidence whatsoever showing that the shirt was "false evidence," much less that the prosecution was aware of any such falsity.  At trial, the t-shirt was

---

[28] Rec. Doc. 13-9, pp. 110-11; State v. Sexton, 377 So. 3d 234 (La. 2024).

admitted into evidence in connection with the testimony of Natasha Poe, the DNA Technical Leader of the St. Tammany Parish Coroner's Office.[29]   The scientific analysis of the shirt confirmed that the DNA on the shirt was consistent with the victim's DNA.[30]   Then, during Detective Carlee Messina's testimony, she testified that she collected that t-shirt from the petitioner's residence and identified both the t-shirt and a photograph showing that t-shirt on the bedroom floor.[31]   Despite some inconsistency in the testimony regarding whether the shirt was green or gray, the jury was able to view the shirt itself and the photograph and, in any event, petitioner has produced no evidence to dispute that the shirt introduced into evidence was the same shirt collected from the bedroom.   Given that petitioner points to no proof establishing that the shirt constituted "false evidence," he has, as the Louisiana Supreme Court noted, failed to meet his burden of proof with respect to this claim.

For all of the foregoing reasons, petitioner simply has not demonstrated that the state court decision rejecting this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.   Accordingly, applying the AEDPA's deferential standard of review, this Court should likewise reject that claim.

### D.  Ineffective Assistance of Counsel Regarding Drug Screen Results

As his fourth claim, petitioner asserts:  "Ineffective assistance of counsel for failing to challenge the admissibility of the urine drug screen results."[32]   In the state post-conviction proceedings, the state district court denied relief, holding:

---

[29] Rec. Doc. 13-3, p. 19.
[30] See Rec. Doc. 13-1, p. 133, ¶ 38.
[31] Rec. Doc. 13-3, pp. 165-66.
[32] Rec. Doc. 3, p. 10.

With regard to the drug tests which are the subject of Defendant's first claim, these two claims allege ineffective assistance of counsel for failure to challenge the admissibility of the tests and re-urge a Motion in Limine to do so.

Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) sets for the standard for analyzing ineffective assistance of counsel claims.

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.  First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

To establish prejudice under Strickland, a Petitioner must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  466 U.S. at 694, 104 S. Ct. at 2068.  "The mere possibility of a different outcome is not sufficient to prevail on the prejudice prong."  Ransom v. Johnson, 126 F. 3d 716, 721 (5th Cir. 1997) cert denied 522 U.S. 944, 118 S. Ct. 361, 139 L. Ed. 2d. 281 (1997).

As stated in response to Claim 1, the confirmation test was part of the Children's records which defense counsel admitted having received.  Therefore, counsel's failure to challenge admission of the drug test on the basis of the State's alleged Brady violation was not deficient performance.  There was no basis for another Motion in Limine as the confirmation had been provided.

Again with regard to Defendant's arguments about blood tests, none were ordered or done.  Defendant maintains that the presence of Xanax and valium in victim's tests "contradicts prosecution argument that Mr. Sexton gave alleged victim his sister's medication."  Testing positive for one drug does not negate the presence of any other drug especially since the levels of temazepam were by far the highest.

The victim testified that the Defendant gave her several different pills.  Only his sister's temazepam seized in the search matched the drugs present in the victim's drug screens.  The fact that those other drugs were not found in the search does not mean that Defendant did not have them or did not give them to the victim, only that the State was not able to prove that fact and did not so argue.

Sexton also argues that Mecca should have cross examined the Mother about her prescription for Xanax.  First, no such prescription has been established.  Further, the State did not call the Mother as a witness and in order for Mecca to question her, he would have had to call her to the stand.  Given the dynamics of the Mother's refusal to cooperate and the suggestions made in Defendant's jail calls, the fact that Mecca elected not to do so was a well thought out strategic decision.  Therefore, the arguments are irrelevant and unsupported. [33]

The Louisiana First Circuit Court of Appeal then denied petitioner's related writ application without assigned reasons.[34]  The Louisiana Supreme Court thereafter likewise denied relief, simply stating:  "Applicant fails to show that he received ineffective assistance of counsel under the standard of <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[35]

As the state courts correctly noted, the clearly established federal law governing such claims is <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  In <u>Strickland</u>, the United States Supreme Court held:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction … has two components.  First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction … resulted from a breakdown in the adversary process that renders the result unreliable.

<u>Id.</u> at 687.

---

[33] Rec. Doc. 13-7, pp. 76-78.

[34] Rec. Doc. 13-7, p. 175; <u>State v. Sexton</u>, No. 2023 KW 0500, 2023 WL 4842840 (La. App. 1st Cir. July 28, 2023). An earlier related writ application had been denied because petitioner failed to provide the required supporting documentation; however, he was given the opportunity to refile a proper and complete application.  Rec. Doc. 13-7, p. 174; <u>State v. Sexton</u>, No. 2023 KW 0122, 2023 WL 3058327 (La. App. 1st Cir. Apr. 24, 2023).

[35] Rec. Doc. 13-9, pp. 110-11; <u>State v. Sexton</u>, 377 So. 3d 234 (La. 2024).

When assessing whether counsel's performance was deficient, a court must always remember that "Strickland does not guarantee perfect representation, only a reasonably competent attorney." Harrington v. Richter, 562 U.S. 86, 110 (2011). Therefore, "[t]o establish deficient performance, a person challenging a conviction must show that counsel's representation fell below an objective standard of reasonableness." Id. at 104 (quotation marks omitted). Moreover, the Supreme Court has cautioned:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

Strickland, 466 U.S. at 689 (citations and quotation marks omitted).

> Strickland's prejudice component is no less exacting. The Supreme Court has explained:

> In assessing prejudice under Strickland, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. Instead, Strickland asks whether it is reasonably likely the result would have been different. This does not require a showing that counsel's actions more likely than not altered the outcome, but the difference between Strickland's prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable.

Richter, 562 U.S. at 111-12 (citations and quotation marks omitted).

24

Further, because petitioner's ineffective assistance of counsel claim was denied on the merits in state court, the AEDPA's deferential standards of review apply to this Court's review. Therefore, to prevail on his claims in this federal proceeding, petitioner must show that the state court decision denying the claims on the merits was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); Adekeye v. Davis, 938 F.3d 678, 682 (5th Cir. 2019); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002).

Where, as here, the state court has correctly identified Strickland as the controlling federal law in its denial of the claim, the question on habeas review "is whether the state court's application of the Strickland standard was unreasonable."  Richter, 562 U.S. at 101.  The United States Supreme Court has cautioned:

> This is different from asking whether defense counsel's performance fell below Strickland's standard.  Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court.  Under AEDPA, though, it is a necessary premise that the two questions are different.  For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law.  A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.

Id. (citation and quotation marks omitted).  Therefore, "[f]ederal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard."  Id. at 105 (emphasis added).  As a result, in effect, the federal habeas court must "afford

**both** the state court **and** the defense attorney the benefit of the doubt." <u>Woods v. Etherton</u>, 578 U.S. 113, 117 (2016) (emphasis added; quotation marks omitted).

Applying these stringently deferential standards of review, this Court finds that, for the following reasons, the state court correctly and reasonably denied petitioner's ineffective assistance claim on the merits.

This claim warrants little discussion. Petitioner has failed to identify any legitimate basis on which defense counsel could have challenged the drug screen tests. The test results were properly confirmed and authenticated, and they were provided to defense counsel through discovery in advance of trial. Therefore, any motion challenging the admissibility of the tests would have been meritless, and it is beyond cavil that counsel cannot be considered ineffective for failing to make a meritless motion. <u>United States v. Gibson</u>, 55 F.3d 173, 179 (5th Cir. 1995) ("Counsel is not required by the Sixth Amendment to file meritless motions."); <u>see also</u> <u>United States v. Kimler</u>, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument ... cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue."); <u>Sones v. Hargett</u>, 61 F.3d 410, 415 n.5 (5th Cir. 1995) ("Counsel cannot be deficient for failing to press a frivolous point.").

That said, the Court does not mean to diminish the fact that defense counsel was seemingly unaware that the confirmation test results were in the discovery he was provided. That, obviously, is problematic. Nevertheless, even where a petitioner can show that his counsel's preparation and investigation were deficient, that still is "only half the battle. To be entitled to relief, he must *also* prove that prejudice *actually resulted* from the purportedly inadequate preparation or

investigation." <u>Ross v. Vannoy</u>, Civ. Action No. 16-2568, 2016 WL 4991537, at *6 (E.D. La. July 5, 2016), <u>adopted</u>, 2016 WL 4942846 (E.D. La. Sept. 16, 2016). That requires that he "point to evidence establishing that better preparation or more thorough investigation would have actually benefited the defense, for example by showing that exculpatory evidence existed and would have been revealed through additional efforts." <u>Id.</u> Petitioner has not made that showing.

As noted, defense counsel was made aware of the confirmation test results at the commencement of trial, and, therefore, had sufficient to time to use them to his advantage if he believed that would benefit the defense. Moreover, even if did not learn of them in sufficient time to file a pretrial motion challenging them, that is of no moment – for, as already explained, there was no meritorious motion he could have filed even if he had been aware of the results.

Lastly, to the extent that petitioner is claiming that counsel was ineffective for failing to call the victim's mother as a witness in order to ask about her purported prescription for Xanax, that, too, fails. The United States Fifth Circuit Court of Appeals has explained:

> Claims that counsel failed to call witnesses are not favored on federal habeas review because the presentation of witnesses is generally a matter of trial strategy and speculation about what witnesses would have said on the stand is too uncertain. For this reason, we require petitioners making claims of ineffective assistance based on counsel's failure to call a witness to demonstrate prejudice by naming the witness, demonstrating that the witness was available to testify and would have done so, setting out the content of the witness's proposed testimony, and showing that the testimony would have been favorable to a particular defense. This requirement applies to both uncalled lay and expert witnesses.

<u>Woodfox v. Cain</u>, 609 F.3d 774, 808 (5th Cir. 2010) (citations, quotation marks, and brackets omitted); <u>accord</u> <u>Day v. Quarterman</u>, 566 F.3d 527, 538 (5th Cir. 2009) ("[T]o prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out

the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense.").

Here, petitioner presented no evidence, such as an affidavit from the mother, demonstrating that she would have testified in a manner beneficial to the defense. Therefore, he failed to meet his burden of proof with respect to this claim. See, e.g., United States v. Cockrell, 720 F.2d 1423, 1427 (5th Cir. 1983) (courts view "with great caution claims of ineffective assistance of counsel when the only evidence of a missing witness's testimony is from the defendant"); Buniff v. Cain, Civ. Action No. 07-1779, 2011 WL 2669277, at *3 (E.D. La. July 7, 2011); Anthony v. Cain, Civ. Action No. 07-3223, 2009 WL 3564827, at *8 (E.D. La. Oct. 29, 2009) ("This Court may not speculate as to how such witnesses would have testified; rather, a petitioner must come forward with evidence, such as affidavits from the uncalled witnesses, on that issue."); Combs v. United States, Nos. 3:08-CV-0032 and 3:03-CR-0188, 2009 WL 2151844, at *10 (N.D. Tex. July 10, 2009) ("Unless the movant provides the court with affidavits, or similar matter, from the alleged favorable witnesses suggesting what they would have testified to, claims of ineffective assistance of counsel fail for lack of prejudice."); Harris v. Director, TDCJ-CID, No. 6:06cv490, 2009 WL 1421171, at *7 (E.D. Tex. May 20, 2009) ("Failure to produce an affidavit (or similar evidentiary support) from the uncalled witness is fatal to the claim of ineffective assistance.").

In summary, to be entitled to relief, petitioner must demonstrate that the state court decision rejecting his ineffective assistance of counsel claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. He has not made that showing in the instant case. Accordingly, utilizing the AEDPA's

doubly deferential standards of review applicable to such claims, this Court should likewise deny relief.

### E.  Ineffective Assistance of Counsel Regarding Shirt /

### F.  Ineffective Assistance of Counsel Regarding Petitioner's Medical History

As his fifth claim, petitioner asserts:  "Mr. Mecca, failed to adequately investigate evidence related to a T-shirt introduced at my trial, which I believe constitutes ineffective assistance of counsel."[36]  Further, as his sixth claim, he asserts:  "Mr. Mecca's failure to investigate my medical history constitutes deficient performance.  This lack of investigation hindered my ability to effectively challenge the prosecution's case.  The error had a prejudicial impact on my defense strategy."[37]  In the state post-conviction proceedings, the state district court denied relief, holding:

> In these Claims, Defendant urges a Strickland claim relative to counsel's failure to investigate the shirt subject of Claim 2.  He states that his attorney never provided a clear photograph of the shirt and never discussed that particular item of evidence with him.  Undoubtably, an attorney has a duty to investigate.  "A defendant who asserts a claim of ineffective counsel based on a failure to investigate must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial.  General statements and conclusory charges will not suffice."  State v. Castenada, 94-1118 (La. App. 1st Cir. 6/23/95), 658 So 2d 297, 306.
>
> Admittedly, the photographs introduced at trial taken by Detective Messina were blurry.  However, Mecca had no ability to alter those photos to make them clearer after the fact.  He was not present during collection of the shirt as evidence and did not become Defendant's attorney until months later.[FN 7]  Defendant seems to argue that introduction of the shirt evidence was a surprise.  This statement, like others, is unsupported and inconceivable given Mecca's experience as an attorney, former police officer, his acceptance of discovery prior to trial and Defendant's girlfriend's testimony about the shirt at trial.
>
> [FN 7]  Initially, Defendant was represented by other counsel who withdrew after Defendant absconded.

---

[36] Rec. Doc. 3, p. 19.
[37] Rec. Doc. 3, p. 22.

> Sexton also alleges that Mecca failed to investigate his medical records, which he asserts would have revealed a long standing history of penile discharge, a factor he suggests would have exonerated him. Defendant has had several years to obtain medical records to establish that history and he has offered none. Further, Defendant did not deny sexual contact with the victim. Rather, his defense was that the victim "came on to him." Therefore, even accepting Defendant's version of the facts, evidence of that discharge, his DNA, would certainly have been present on the victim, no matter which one of them initiated the contact. [38]

The Louisiana First Circuit Court of Appeal then denied petitioner's related writ application without assigned reasons.[39] The Louisiana Supreme Court thereafter likewise denied relief, simply stating: "Applicant fails to show that he received ineffective assistance of counsel under the standard of <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[40]

With respect to such claims challenging the adequacy of counsel's investigations, the United States Fifth Circuit Court of Appeals has explained:

> In general, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. A particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. An attorney must engage in a reasonable amount of pretrial investigation and at a minimum, interview potential witnesses and make an independent investigation of the facts and circumstances in the case. …
>
> We have explained the prejudice standard in such cases this way: "A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial."

<u>Adekeye v. Davis</u>, 938 F.3d 678, 682-83 (quoting <u>United States v. Green</u>, 882 F.2d 999, 1003 (5th Cir. 1989)) (footnotes, quotation marks, brackets, and ellipses omitted). However, where, as here,

---

[38] Rec. Doc. 13-7, pp. 78-79.
[39] Rec. Doc. 13-7, p. 175; <u>State v. Sexton</u>, No. 2023 KW 0500, 2023 WL 4842840 (La. App. 1st Cir. July 28, 2023). An earlier related writ application had been denied because petitioner failed to provide the required supporting documentation; however, he was given the opportunity to refile a proper and complete application. Rec. Doc. 13-7, p. 174; <u>State v. Sexton</u>, No. 2023 KW 0122, 2023 WL 3058327 (La. App. 1st Cir. Apr. 24, 2023).
[40] Rec. Doc. 13-9, pp. 110-11; <u>State v. Sexton</u>, 377 So. 3d 234 (La. 2024).

the state courts have denied such a claim on the merits, federal habeas relief is warranted only if the petitioner shows that the state court's denial was unreasonable.  See id. at 683-84.  And a petitioner can make that showing only by pointing to "concrete evidence" – a petitioner's conclusory allegations alone will not suffice.  Id. at 684 & n.35; Ross v. Estelle, 694 F.2d 1008, 1011-12 (5th Cir. 1983) ("Absent evidence in the record, a court cannot consider a habeas petitioner's bald assertions on a critical issue in his *pro se* petition (in state and federal court), unsupported and unsupportable by anything else contained in the record, to be of probative evidentiary value.  We are thus bound to re-emphasize that mere conclusory allegations do not raise a constitutional issue in a habeas proceeding." (citation and footnote omitted)).

As to the shirt, it is not apparent – and petitioner does not specify – what additional investigation into the shirt could have accomplished.  As the state district court noted, there is no indication that the shirt's collection as evidence or that the testimony concerning the shirt was a surprise to the defense.  Further, there is no suggestion that the shirt was not collected from the residence.  It is unclear what further "investigation" concerning the shirt petitioner believes would have been beneficial to the defense.   Because petitioner has not established that further investigation would have borne beneficial fruit, his claim concerning the shirt unsupported.

As to his claim concerning the medical records, petitioner has not established that relief is warranted on that claim.  With respect to the claim, petitioner alleges:

> I have a medical history of penile discharge unrelated to sexually transmitted diseases, crucial for the defense.  I contracted an STD and received treatment well before the incident, pertinent to the case context.  My medical records, which support these facts, were not utilized in my defense due to insufficient investigation.[41]

---

[41] Rec. Doc. 3, p. 23.

The medical records to which petitioner is seemingly referring concern his treatment at North Oaks Medical Center in 2012. Those records, which are included in the state court record,[42] show that petitioner sought treatment for urethral discharge. The examination revealed: "Scant amount of clear urethral discharge no testicular tenderness or penile skin breakdown or ulceration."[43] The diagnosis was "Urethritis nonspecific abdominal pain."[44] He was treated with antibiotics.[45]

Although petitioner opines that these records could have been utilized to benefit his defense, his basis for that opinion is unclear. The records related to a single instance of an infection – an infection which was treated and apparently cured – more than four years prior to the crime. Petitioner fails to explain how this information was in any way exculpatory. There is no suggestion that he was suffering from a similar infection at the time of the instant crime. Further, even if he were, it is unclear what petitioner believes that would prove. Because he provides no explanation of how an alleged penile discharge from urethritis would cast doubt on the fact that his semen was found on the victim or that he was the perpetrator of the crime, the state courts were correct to deny this vague and conclusory claim.

In summary, to be entitled to relief, petitioner must demonstrate that the state court decision rejecting his ineffective assistance of counsel claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. He has not made that showing in the instant case. Accordingly, utilizing the AEDPA's doubly deferential standards of review applicable to such claims, this Court should likewise deny relief.

---

[42] Rec. Doc. 13-8, pp. 205-17.
[43] Rec. Doc. 13-8, p. 210.
[44] Rec. Doc. 13-8, p. 211.
[45] Rec. Doc. 13-8, p. 209.

### G.  Claims Regarding CAC Tapes and Dr. Jackson's Incident History

As his seventh claim, petitioner asserts:  "Prosecutorial misconduct in failing to satisfy the requirement of R.S. 15:440.5; ineffective assistance of counsel for failing to challenge or object to admissibility of the CAC tapes and incident history of Dr. Jamie Jackson; Confrontation Clause."[46] In the state post-conviction proceedings, the state district court found that this claim was both procedurally barred in part and lacked merit.  As to the merits of the claim, the court held:

> In these claims, Defendant alleges that both through prosecutorial misconduct and ineffective assistance of counsel, the CAC and AHCC tapes were admitted into evidence contrary to the provisions of R.S. 15:440.5.  That statute sets forth the criteria for admission of an out of court videotape of a statement made by a protected person.  Subsection (8) of that statute requires that "The protected person is available to testify."  Defendant argues that because the victim was uncooperative and recanted her allegations of sexual abuse at trial, she was "unavailable."  Unavailable is defined by La. C.E. Art. 804 (A) as "when the declarant cannot or will not appear in court and testify as to the substance of his statement made outside of court."  The victim and her Mother had been served with subpoenas for trial, were present in the courthouse during the entire trial and **the victim testified**.  Contrary to Defendant's argument, State v. Eley, 2015-1925 (La. App. 1 Cir. 9/16/16), 203 So. 3d 462, 470, writ denied, 2016-1844 (La. 9/6/17), 224 So. 3d 982 held that "The law, thus, requires only that the victim be available at trial to testify," regardless of lack of memory or denial.
>
> Defendant also argues a violation of the confrontation clause, by the State and by his attorney's failure to object, presumably in terms of "confrontation" of the victim by Mecca by means of questioning.  However, pursuant to Eley, supra, the victim took the stand at trial which satisfies the confrontation clause.  Further discussion of this issue is raised in Claim 18 and will be dealt with in greater detail in that section of this Order. [47]

The Louisiana First Circuit Court of Appeal then denied petitioner's related writ application without assigned reasons.[48]  The Louisiana Supreme Court thereafter likewise denied relief, simply

---

[46] Rec. Doc. 3, p. 25.

[47] Rec. Doc. 13-7, pp. 79-80.

[48] Rec. Doc. 13-7, p. 175; State v. Sexton, No. 2023 KW 0500, 2023 WL 4842840 (La. App. 1st Cir. July 28, 2023). An earlier related writ application had been denied because petitioner failed to provide the required supporting documentation; however, he was given the opportunity to refile a proper and complete application.  Rec. Doc. 13-7, p. 174; State v. Sexton, No. 2023 KW 0122, 2023 WL 3058327 (La. App. 1st Cir. Apr. 24, 2023).

stating: "Applicant fails to show that he received ineffective assistance of counsel under the standard of <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). With respect to his remaining claims, he fails to meet his post-conviction burden of proof. La.C.Cr.P. arts. 930.2."[49]

Again, because the Louisiana Supreme Court denied the claims on the merits, federal review is not procedurally barred. <u>See</u> <u>Rhoades v. Davis</u>, 914 F.3d 357, 372 (5th Cir. 2019). But, once more, relief should be denied on the merits for the following reasons.

This claim concerns the introduction and admission into evidence of two pieces of evidence: (1) the recording of the Children's Advocacy Center forensic interview of the victim and (2) the recording of the victim's interview by Dr. Jamie Jackson of the Audrey Hepburn Care Center of the Children's Hospital. That evidence was admitted without objection from the defense.[50]

To the extent that petitioner is arguing that the admission of the evidence violated state evidentiary rules, that issue is not one for this federal court. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions such as the admissibility of evidence under state procedural rules." <u>Goodrum v. Quarterman</u>, 547 F.3d 249, 261 (5th Cir. 2008) (quotation marks omitted); <u>accord</u> <u>Cronnon v. Alabama</u>, 587 F.2d 246, 250 (5th Cir. 1979) (noting that federal courts "do not sit as a 'super' state supreme court" in a habeas corpus proceeding to review errors under state law" (quotation marks omitted)).

---

[49] Rec. Doc. 13-9, pp. 110-11; <u>State v. Sexton</u>, 377 So. 3d 234 (La. 2024).
[50] Rec. Doc. 13-3, p. 175 (the Children's Advocacy Center forensic interview); Rec. Doc. 13-4, pp. 37-38 (Dr. Jackson's interview).

Nevertheless, because petitioner has asserted a related claim that counsel was ineffective for failing to challenge or object to that evidence, the Court must consider whether such a challenge would have had merit. Here, however, it is clear that there was no legitimate basis for any such challenge or objection for the following reasons.

Admission of the Children's Advocacy Center forensic interview was governed by La. Rev. Stat. Ann. § 15:440.5. In pertinent part, that statute provides:

> A. The videotape of an oral statement of the protected person made before the proceeding begins may be admissible into evidence if:
>
> (1) No attorney for either party was present when the statement was made;
> (2) The recording is both visual and oral and is recorded on film or videotape or by other electronic means;
> (3) The recording is accurate, has not been altered, and reflects what the witness or victim said;
> (4) The statement was not made in response to questioning calculated to lead the protected person to make a particular statement;
> (5) Every voice on the recording is identified;
> (6) The person conducting or supervising the interview of the protected person in the recording is present at the proceeding and available to testify or be cross-examined by either party;
> (7) The defendant or the attorney for the defendant is afforded an opportunity to view the recording before it is offered into evidence; and
> (8) The protected person is available to testify.

La. Rev. Stat. Ann. § 15:440.5. Here, petitioner argues that the recording was inadmissible because the eighth requirement, i.e. that "[t]he protected person is available to testify," was not met in this case. He is incorrect. The victim in this case was available to testify; in fact, she did testify. The requirement of the state statute was therefore met. See, e.g., State v. Eley, 203 So. 3d 462, 467-71 (La. App. 1st Cir. 2016), writ denied, 224 So. 3d 982 (La. 2017).

Likewise, admission of Dr. Jackson's interview was also proper. Under Louisiana law, "statements for purposes of medical treatment and medical diagnosis in connection with treatment"

are not considered inadmissible hearsay.  La. C.E. art. 803(4).  Further, Louisiana law also specifically permits the introduction of "a statement made by the victim of a sexually oriented criminal offense to a healthcare provider during the course of a forensic medical examination." La. C.E. art. 801(D)(1)(e).  Under those provisions, Dr. Jackson interview was admissible.

In light of the foregoing, both the Children's Advocacy Center interview and Dr. Jackson's interview were admissible under Louisiana law.  Because there was no legitimate basis for an objection to the evidence, petitioner's related ineffective assistance of counsel claim necessarily fails, because, as already explained *supra*, "[c]ounsel cannot be deficient for failing to press a frivolous point."  Sones v. Hargett, 61 F.3d 410, 415 n.5 (5th Cir. 1995); accord United States v. Kimler, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument ... cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue.").

Petitioner's attempt to alternatively frame his claim as a Confrontation Clause violation fares no better.  "[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements. … The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it."  Crawford v. Washington, 541 U.S. 36, 59 n.9 (2004) (citations omitted); accord Alvarez v. Cain, No. 13-6405, 2014 WL 5040698, at *11 (E.D. La. Sept. 25, 2014) ("No violation of the Confrontation Clause occurs where the declarant testifies at trial and is subject to cross-examination.").  Because the victim appeared at trial and was available for cross-examination, there was no Confrontation Clause violation arising for the use of the evidence.

In summary, to be entitled to relief, petitioner must demonstrate that the state court decision rejecting these claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  He has not made that showing in the instant case.  Accordingly, this Court should likewise deny relief.

### H.  Ineffective Assistance of Counsel During Direct Examination and Voir Dire

As his eighth claim, petitioner asserts:   "During direct examination, Mr. Mecca's questioning about my failure to appear in court allowed the prosecution to introduce the narrative involving Dog The Bounty Hunter, who was featured in the TV show 'Dogs Most Wanted Mardi Gras Manhunt' just days before the trial."[51]  He further asserts:  "Mr. Mecca failed to inquire during voir dire if jurors had seen 'Dogs Most Wanted Mardi Gras Manhunt.'  This oversight was critical given the show's negative portrayal of me as a fugitive, which could have influenced the jurors' perceptions."[52]   In the state post-conviction proceedings, the state district court denied relief, holding:

> After his initial arrest, Defendant bonded out.  Several months later he was arrested yet again, this time for a third offense possession of marijuana.  He testified that he was worried that the State would revoke his bond on the subject offense and therefore, failed to appear and an attachment was issued.   He eventually was arrested several months later.  In these two <u>Strickland</u> claims, Defendant seems to urge mutually exclusive arguments.  First, the attorney improperly "opened the door" for the State's argument about "Dog the Bounty Hunter" having tracked him down, and second, despite his argument that it was improper for Mecca to reference that factor, for failing to bring up "Dog" during voir dire.  Defendant can't have his cake and eat it too.
>
> Defendant testified at trial.  Taking the stand exposed Defendant to the full brunt of the State's questions relative to his past.
>
> In order to diffuse [sic] the issue of Defendant's failure to appear, Mecca brought it up in his direct examination.  This tactic is often used so as to make the jurors aware of the issue in a less accusatory light than if it had been left for the

---

[51] Rec. Doc. 3, p. 28.
[52] Rec. Doc. 3, p. 29.

State to mention during cross examination. Mecca never mentioned Dog the Bounty Hunter. That is, he did not "open the door" contrary to Defendant's assertions. "Dog" was first mentioned by the State, which was its right, during the Defendant's cross examination. Even if Mecca had not questioned Defendant about having absconded, the State was free to ask the question. The real inculpatory evidence was not that a television personality had a role in finding the absent Defendant, but rather, that Defendant evaded prosecution. These claims have no merit. [53]

The Louisiana First Circuit Court of Appeal then denied petitioner's related writ application without assigned reasons. [54] The Louisiana Supreme Court thereafter likewise denied relief, simply stating: "Applicant fails to show that he received ineffective assistance of counsel under the standard of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)." [55]

For the following reasons, petitioner has not demonstrated that the state court decision rejecting these ineffective assistance of counsel claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

As for petitioner's claim that defense counsel was ineffective for raising petitioner's fugitive status on direct examination, that claim is meritless. Because petitioner opted to testify in his own defense at trial, the prosecutor was free to ask him about his fugitive status (including any related involvement of a celebrity bounty hunter), regardless of whether defense counsel raised the issue on direct examination. Moreover, since it was likely that the fugitive status would in fact be

---

[53] Rec. Doc. 13-7, pp. 81-82.
[54] Rec. Doc. 13-7, p. 175; State v. Sexton, No. 2023 KW 0500, 2023 WL 4842840 (La. App. 1st Cir. July 28, 2023). An earlier related writ application had been denied because petitioner failed to provide the required supporting documentation; however, he was given the opportunity to refile a proper and complete application. Rec. Doc. 13-7, p. 174; State v. Sexton, No. 2023 KW 0122, 2023 WL 3058327 (La. App. 1st Cir. Apr. 24, 2023).
[55] Rec. Doc. 13-9, pp. 110-11; State v. Sexton, 377 So. 3d 234 (La. 2024).

raised by the prosecutor, it was not unreasonable for defense counsel to try to blunt the impact by preemptively raising the issue on direct examination.  As one court observed:

> [A]n attorney who discusses their client's potentially negative information is not ineffective.  It is a trial strategy utilized to lessen the damage of opposing counsel's argument using that information.  Law schools throughout the country teach this tactic to trial advocacy students.  By discussing the client's potentially negative information, an attorney helps to control the narrative of that information and shows to the jury that no information is being concealed.

Robinson v. Beard, No. 06-cv-00839, 2020 WL 5362133, at *22 (E.D. Pa. Sept. 8, 2020), aff'd, 97 F.4th 985 (3rd Cir. 2024); accord Saunders v. Warden, Holman Correctional Facility, 803 F. App'x 343, 347-48 (11th Cir. 2020) ("[I]t was not deficient for counsel to ask [petitioner] questions about his criminal acts that elicited negative information.  One reasonable explanation for those questions is that his trial counsel was trying to draw the sting out of the prosecution's argument and gain credibility with the jury by conceding the weaknesses of his own case." (quotation marks omitted)).

As for petitioner's claim that counsel was ineffective for failing to expressly raise the issue of "Dog the Bounty Hunter" during his voir dire questioning, that claim is likewise meritless.  As the United States Fifth Circuit Court of Appeals has explained:

> [An] attorney's actions during voir dire are considered to be a matter of trial strategy.  A decision regarding trial tactics cannot be the basis for a claim of ineffective assistance of counsel unless counsel's tactics are shown to be so ill chosen that it permeates the entire trial with obvious unfairness.

Teague v. Scott, 60 F.3d 1167, 1172 (5th Cir. 1995) (quotation marks omitted).  A defendant's disagreement with counsel's tactics or strategy during voir dire does not support a claim of ineffective assistance of counsel.  See Seigfried v. Greer, 372 F. App'x 536, 540-41 (5th Cir. 2010).

Here, petitioner's claim makes little sense.  By his own admission, he did not want the bounty hunter's involvement in his case revealed at trial.  In light of that preference, he cannot reasonably fault counsel's decision to forego a specific question concerning "Dog the Bounty Hunter" during voir dire.  Moreover, counsel did broach the subject in a more general way, asking, "How many of y'all watch the cop shows, CSI, Cops?  I'm not sure what else is out there."[56]  Various jurors responded, acknowledging that they watched "CSI," "NCIS," "Perry Mason," "NCIS Los Angeles," and "48 Hours."[57]  That adequately addressed the potential jurors' interest in such shows, to whatever extent that was thought to be important.  If counsel had then followed up by asking about "Dog the Bounty Hunter" in particular, that would have risked being perceived as so oddly specific as to perhaps raise unwanted questions in the jurors' minds – and, more importantly, again, **it was an issue petitioner did not want mentioned**.

Lastly, in any event, petitioner simply has not met his required burden of proof.  As the United States Fifth Circuit Court of Appeals has explained:

> [A] petitioner alleging deficient performance during jury selection must identify "any particular juror [who] was in fact prejudiced" and must establish that had counsel's questioning focused on a specific area of bias, the bias would have been found.  The petitioner must also show prejudice caused by the deficiency such that "there is reasonable probability that the result of the proceedings would have been different."

Villanueva v. Stephens, 555 F. App'x 300, 306 (5th Cir. 2014) (footnotes omitted and quoting Neville v. Dretke, 423 F.3d 474, 483 (5th Cir. 2005)).  Here, there is no evidence whatsoever that any potential juror had seen the specific program involving petitioner, much less that any such juror had a negative impression of petitioner because of that program.  Petitioner therefore has not

---

[56] Rec. Doc. 13-2, pp. 75-76.
[57] Rec. Doc. 13-2. Pp. 76-77.

shown that there is a reasonable probability that the result of the proceedings would have been different if only counsel had specifically asked about "Dog the Bounty Hunter."

In summary, to be entitled to relief, petitioner must demonstrate that the state court decision rejecting his ineffective assistance of counsel claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. He has not made that showing in the instant case. Accordingly, utilizing the AEDPA's doubly deferential standards of review applicable to such claims, this Court should likewise deny relief.

## I.  Recusal

As his ninth claim, petitioner asserts:  "The necessary motion for recusal was not filed by my counsel despite the evident conflict of interest arising from Judge Gardner's prior testimony in favor of Mr. Mecca.  Judge Gardner did not recuse himself in my case, which I contend constitutes judicial misconduct due to his previous involvement in a disciplinary hearing favoring my counsel and his membership in the Louisiana Foundation Against Sexual Assaults while presiding over a sex crime case."[58]  In the state post-conviction proceedings, the state district court found that this claim was both procedurally barred in part and lacked merit.  As to the merits of the claim, the court held:

> Defendant argues that Mecca should have moved to recuse the trial judge and that the judge should have recused himself.  Defendant gives two bases for these claims:  that Judge Gardner testified at Mecca's disciplinary proceeding and that the Judge was a member of the Louisiana Foundation Against Sexual Assaults. Defendant incorrectly identifies the applicable recusal article in that he cites to the Code of Civil Procedure instead of the Code of Criminal Procedure.  Presumably, Defendant is relying on subsection (1) of C.Cr.P. Art. 671 which calls for recusal when a judge "is biased, prejudiced, or personally interested in the cause to such an

---

[58] Rec. Doc. 3, p. 31.

extent that he would be unable to conduct a fair and impartial trial." Petitioner has correctly set forth the long standing application of the recusal articles when he cites State v. Collins 288 So 2d 602 (La. 1974) for the proposition that "a judge is presumed to be impartial" and State v. Qualls 377 So 2d 293 (La. 1979) as requiring that "such bias, prejudice and personal interest must be of a substantial nature based on more than mere conclusory allegations."

Generally speaking, a person arguing for recusal usually attempts to establish evidence of bias or prejudice against the mover. Defendant, however establishes that Judge Gardner testified in favor of Mecca. That fact might offer support for an argument by the State for recusal, but not a Strickland violation for Mecca's failure to so move. Likewise, the court was under no ethical obligation given the circumstances to self-recuse. Defendant's quotations from the disciplinary hearing clearly reject his allegations of bias or prejudice against Mecca. Defendant offers no evidence of any animus the judge might have had against Defendant himself.

Defendant then seems to make the rather unique and (once again) circular argument that the fact that Judge Gardner testified in favor of Mecca might prejudice him in evaluating Defendant's post-conviction Strickland claims. As previously stated, a judge is presumed to be unbiased. In considering Defendant's claims, the court reviews counsel's actions leading up to and at trial which in all regards in the case at bar, were reasonable. Defendant offers no sufficient evidence to the contrary. Finally, Defendant offers no support for his statement that at the time of trial, the Judge was a member of the Louisiana Foundation Against Sexual Assaults. Therefore, he has failed to meet his burden of proof of substantial bias or prejudice. These claims lack merit. [59]

The Louisiana First Circuit Court of Appeal then denied petitioner's related writ application without assigned reasons.[60] The Louisiana Supreme Court thereafter likewise denied relief, simply stating: "Applicant fails to show that he received ineffective assistance of counsel under the standard of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). With respect to his remaining claims, he fails to meet his post-conviction burden of proof. La.C.Cr.P. arts. 930.2."[61]

---

[59] Rec. Doc. 13-7, pp. 82-83.
[60] Rec. Doc. 13-7, p. 175; State v. Sexton, No. 2023 KW 0500, 2023 WL 4842840 (La. App. 1st Cir. July 28, 2023). An earlier related writ application had been denied because petitioner failed to provide the required supporting documentation; however, he was given the opportunity to refile a proper and complete application. Rec. Doc. 13-7, p. 174; State v. Sexton, No. 2023 KW 0122, 2023 WL 3058327 (La. App. 1st Cir. Apr. 24, 2023).
[61] Rec. Doc. 13-9, pp. 110-11; State v. Sexton, 377 So. 3d 234 (La. 2024).

Again, because the Louisiana Supreme Court denied relief on the merits, these claims are

not procedurally barred on federal habeas review.  See Rhoades v. Davis, 914 F.3d 357, 372 (5th

Cir. 2019).  However, they fail on the merits for the following reasons.

As for petitioner's contention that relief is warranted because the trial judge failed to self-

recuse, that claim is clearly meritless.  Regarding recusal claims, the United States Fifth Circuit

Court of Appeals has held:

> Under the Due Process Clause, a criminal defendant is guaranteed the right
> to a fair and impartial tribunal.  Bracy v. Gramley, 520 U.S. 899, 117 S.Ct. 1793,
> 1797, 138 L.Ed.2d 97 (1997).  The Due Process Clause "establishes a constitutional
> floor, not a uniform standard."  Id.  This floor requires a fair trial, "before a judge
> with no actual bias against the defendant or interest in the outcome of his particular
> case."  Id. (citation omitted).
>
> However, "bias by an adjudicator is not lightly established."  Valley v.
> Rapides Parish Sch. Bd., 118 F.3d 1047, 1052 (5th Cir. 1997).  Courts ordinarily
> "presume that public officials have properly discharged their official duties."  Bracy
> v. Gramley, 117 S.Ct. at 1799 (internal quotation marks and citations omitted).
> General allegations of bias or prejudice are insufficient to establish a constitutional
> violation.  See Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 106 S.Ct. 1580, 1585,
> 89 L.Ed.2d 823 (1986) (holding that general allegations of a judge's frustration with
> insurance companies are not sufficient to force recusal under the Due Process
> Clause from a case in which an insurance company was a party).  The Supreme
> Court has stated that "most matters relating to judicial disqualification [do] not rise
> to a constitutional level."  Id. at 1584 (quoting FTC v. Cement Inst., 333 U.S. 683,
> 68 S.Ct. 793, 804, 92 L.Ed. 1010 (1948)).  So even if a judge is disqualified under
> state or federal law, the disqualification is not always required by the Due Process
> Clause.  See id. at 1585.

Richardson v. Quarterman, 537 F.3d 466, 474-75 (5th Cir. 2008).

For the following reasons, petitioner has not established that his rights under federal law

were violated.  As the United States Fifth Circuit Court of Appeals has noted:

> Bias is a difficult claim to sustain under AEDPA because the Supreme
> Court's case law on bias has acknowledged that what degree or kind of interest is
> sufficient to disqualify a judge from sitting cannot be defined with precision.
> Generally, the Supreme Court has recognized two kinds of judicial bias:  actual bias
> and presumptive bias.

Almost every bias case before the Supreme Court that has found a due process violation has done so based on presumptive bias.  There are three situations in which the Supreme Court has found presumptive bias:

> (1) the decision maker has a direct personal, substantial, and pecuniary interest in the outcome of the case; (2) an adjudicator has been the target of personal abuse or criticism from the party before him; and (3) a judicial or quasi judicial decision maker has the dual role of investigating and adjudicating disputes and complaints.

Buntion v. Quarterman, 524 F.3d 664, 672 (5th Cir. 2008) (citations, quotation marks, and brackets omitted).  In light of the standards of review imposed by 28 U.S.C. § 2254(d)(1), it is important to note that "it is only *clearly established* by Supreme Court precedent that presumptive bias exists in the three circumstances discussed above."  Richardson, 537 F.3d at 476.

Petitioner's allegations against the trial judge in the instant case do not involve any of those three bases for presumptive bias.  Moreover, petitioner has presented no evidence of actual bias.  Therefore, he has not established that the state court's decision denying relief was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent.  Accordingly, his claim concerning self-recusal should be denied.

Petitioner's related claim that counsel was ineffective for failing to file a motion to recuse the trial judge fares no better.  For the reasons already explained, recusal was not required by federal law.  Further, petitioner's allegations do not fit with any of the various grounds which would warrant recusal under Louisiana state law.  See La. Code Crim. P. art. 671. Thus, petitioner has failed to establish that his counsel had a legitimate reason to seek recusal of the trial judge, that a motion to recuse would have been successful, or that he was prejudiced in any way.  As already explained *supra*, counsel cannot be considered ineffective for failing to make a meritless motion.  United States v. Gibson, 55 F.3d 173, 179 (5th Cir. 1995) ("Counsel is not required by

the Sixth Amendment to file meritless motions."); see also United States v. Kimler, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument ... cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue."); Sones v. Hargett, 61 F.3d 410, 415 n.5 (5th Cir. 1995) ("Counsel cannot be deficient for failing to press a frivolous point.").   In the absence of the required showing, petitioner has not demonstrated that the state court's denial of this ineffective assistance of counsel claim was contrary to or an unreasonable application of Supreme Court law, and so he is not entitled to federal habeas relief on this claim.

### J.  Ineffective Assistance of Counsel During Cross-Examination

As his tenth claim, petitioner asserts:  "Despite indications during opening statements that cross-examination would occur, my defense counsel did not question the alleged victim when she was tendered for cross-examination by the state."[62]  In the state post-conviction proceedings, the state district court denied relief, holding:

> Defendant argues that his attorney should have cross examined the victim and his failure to do so prejudiced his case.  At trial, the victim essentially recanted her consistent statements about sexual abuse by Defendant.  She testified as follows:
>
> > Um, so the truth is that – the truth is that it wasn't him in that – it was all my fault.  And the only reason I ever called the police in the first place is because – that I was scared I would get in trouble, and I didn't know that all of this would have happened, and I'm sorry, I guess … It's my fault because I said it was, and that's the truth and that's all I'm going to say, so stop asking me questions.
>
> There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.  See Goodpaster, The Trial for Life:  Effective Assistance of Counsel in Death Penalty Cases, 58 N.Y.U.L.Rev. 299, 343 (1983).  Strickland v. Washington

---

[62] Rec. Doc. 3, p. 34.

466 U.S. 668, 104 S Ct. 2052, 80 L Ed. 2d 674 (1984).  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."  See <u>Michel v. Louisiana</u>, 350 U.S., at 101, 76 S.Ct., at 164.

The purpose of cross-examination is to discredit the witness or her testimony.  The victim herself had given the best testimony Defendant could have hoped for.  Cross examination would have done nothing to improve his chances and could have hurt them.

At the time of his opening statement, Mecca had no knowledge about how the victim would testify or even if she would show up.  His statements during that portion of the proceedings were reasonable and did not obligate him to follow through.  Yet his statements were prophetic.  "I'm not going to relish having to cross-examining her."  Cross examination of children is a difficult task given their vulnerability and need for protection and deference.  Most people, jurors among them, respect and expect these protections.  Counsel's action or inaction in regards to this claim was not deficient performance under <u>Strickland</u>. [63]

The Louisiana First Circuit Court of Appeal then denied petitioner's related writ application without assigned reasons.[64]  The Louisiana Supreme Court thereafter likewise denied relief, simply stating:  "Applicant fails to show that he received ineffective assistance of counsel under the standard of <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[65]

It is clear that "[t]he decision whether to cross-examine a witness, and if so, how vigorously to challenge the witness' testimony, requires a quintessential exercise of professional judgment." <u>Ford v. Cockrell</u>, 315 F. Supp. 2d 831, 859 (W.D. Tex. 2004), <u>aff'd</u>, 135 F. App'x 769 (5th Cir. 2005); <u>accord</u> <u>Lewis v. Cain</u>, Civ. Action No. 09-2848, 2009 WL 3367055, at *8 (E.D. La. Oct.

---

[63] Rec. Doc. 13-7, pp. 83-85.
[64] Rec. Doc. 13-7, p. 175; <u>State v. Sexton</u>, No. 2023 KW 0500, 2023 WL 4842840 (La. App. 1st Cir. July 28, 2023). An earlier related writ application had been denied because petitioner failed to provide the required supporting documentation; however, he was given the opportunity to refile a proper and complete application.  Rec. Doc. 13-7, p. 174; <u>State v. Sexton</u>, No. 2023 KW 0122, 2023 WL 3058327 (La. App. 1st Cir. Apr. 24, 2023).
[65] Rec. Doc. 13-9, pp. 110-11; <u>State v. Sexton</u>, 377 So. 3d 234 (La. 2024).

16, 2009), aff'd, 444 F. App'x 835 (5th Cir. 2011); Williams v. Cain, Civ. Action Nos. 06-0224 and 06-0344, 2009 WL 1269282, at *11 (E.D. La. May 7, 2009), aff'd, 359 F. App'x 462 (5th Cir. 2009); Packnett v. Cain, Civ. Action No. 06-5973, 2008 WL 148486, at *11 (E.D. La. Jan. 10, 2008); Parker v. Cain, 445 F. Supp. 2d 685, 710 (E.D. La. 2006).  The United States Supreme Court has cautioned courts not to second-guess counsel's decisions on such tactical matters through the distorting lens of hindsight; rather, courts are to employ a strong presumption that counsel's conduct falls within a wide range of reasonable assistance and, under the circumstances, might be considered sound trial strategy.  Strickland, 466 U.S. at 689. Moreover, it must be remembered that when a petitioner is asserting a claim of inadequate cross-examination, he bears the burden to prove to show "how a different cross-examination would have created a reasonable probability of a different outcome." Castillo v. Stephens, 640 F. App'x 283, 292 (5th Cir. 2016). Such a showing has not been made in this case.

As the state district court noted, the victim at trial essentially **recanted** her prior accusations against the defendant.  Such a wholesale recantation at trial is the most **pro**-defense testimony a defendant could reasonably expect.  Therefore, tempting fate by cross-examining a recanting victim would be both unwise and possibly counter-productive.  For instance, it is difficult to imagine – and petitioner certainly does not suggest – what beneficial testimony that could have been elicited through cross-examination.

Simply put, a defense counsel's decision to quit while he is ahead upon being presented with such a gift, rather to possibly elicit additional testimony which could undercut the recantation, is clearly evidence of good judgment, not poor judgment.  And, even more to the point here, there

is simply no reasonable probability of a different outcome if only defense counsel had opted to cross-examine the recanting victim.

In summary, to be entitled to relief, petitioner must demonstrate that the state court decision rejecting his ineffective assistance of counsel claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  He has not made that showing in the instant case.  Accordingly, utilizing the AEDPA's doubly deferential standards of review applicable to such claims, this Court should likewise deny relief.

## RECOMMENDATION

It is therefore **RECOMMENDED** that the federal application for habeas corpus relief filed by Jinel Sexton be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[66]

New Orleans, Louisiana, this 13th day of December, 2024.

**JANIS VAN MEERVELD**
**UNITED STATES MAGISTRATE JUDGE**

---

[66] Douglass referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.